**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| In re:<br><br>The Mark Real Estate Holdings, LLC<br><br>Debtor. | Chapter 11<br><br>Case No. 25-20100 |

***INITIAL* OBJECTION OF BUILDERS CAPITAL FINANCE, LLC TO MOTION OF DEBTORS FOR ENTRY OF AN ORDER ON AN INTERIM AND THEN FINAL BASIS: (I) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION FINANCING PURSUANT TO § 364 OF THE BANKRUPTCY CODE; (II) AUTHORIZING THE USE OF CASH COLLATERAL; (III) GRANTING LIENS AND SUPER-PRIORITY CLAIMS; (IV) GRANTING REQUEST FOR EXPEDITED DETERMINATION AND LIMITATION OF NOTICE AND (V) SCHEDULING A FINAL HEARING**

BUILDERS CAPITAL FINANCE, LLC ("**Builder's Capital**" or "**Lender**"), by and through undersigned counsel, files this *Initial* Objection ("**Objection**") to the Motion of Debtor for Entry of an Order on an Interim and Then Final Basis: (I) Authorizing Debtor to Obtain Postpetition Financing Pursuant to § 364 of the Bankruptcy Code; (II) Authorizing the Use of Cash Collateral; (III) Granting Liens and Superior Priority Claims; (IV) Granting Request for Expedited Determinations and Limitations of Notice; and (V) Scheduling a Final Hearing (Doc. No. 8) (the "**Motion**") filed by The Mark Real Estate Holdings, LLC ("**Debtor**"). As its initial opposition to the Motion, Builder's Capital respectfully states as follows:

**SUMMARY OF ARGUMENT**

Since August 2023, Builder's Capital has been the senior secured lender financing the construction of a 45-unit condominium project in Cumberland, Maine. At all times prior to April 3, 2025, the owner of the underlying property was Cumberland Foreside Partners, LLC ("**Cumberland**"). Cumberland also serves as the borrower under Builder's Capital's loan

documents. On April 3, 2025, without any prior or subsequent notice to Builder's Capital, Cumberland executed a Quitclaim Deed purporting to transfer title to the real property to this Debtor, immediately prior to entry of a state court order appointing a receiver. The deed was not recorded until April 22, 2025, precisely 3 hours and 50 minutes prior to the filing of Debtor's bankruptcy petition. This transfer was completely unauthorized and violates numerous provisions of the loan documents. The Motion contains only a bare-bones disclosure of the fact of the transfer, without any explanation or background facts.

Now, on an emergency basis, and just six days after acquiring the property, Debtor seeks to encumber the property with new senior secured liens, without Builder's Capital's consent or even consultation, through a very recently formed and bankrupted entity which has never been Builder's Capital's borrower. As set forth below, both the interim and final requests for DIP financing are, with limited exceptions, unjustifiable, unnecessary, and harmful to Builder's Capital and other creditors. At minimum, there is clearly no need for emergency interim relief prior to an opportunity for limited discovery leading to a final evidentiary hearing.

But, even more egregiously, Debtor utterly fails to disclose that it is a closely held affiliate of the proposed DIP Lender. One individual, Edward Piazza, is in control of both the Debtor and the proposed DIP Lender. Specifically, and as further detailed below: (i) Edward Piazza is manager of the Debtor; (ii) Edward Piazza is manager of Debtor's sole member (Titan Holdings); (iii) Debtor's sole member (Titan Holdings) has the DIP Lender (Titan) as its sole member, and (iv) Edward Piazza is the President of the DIP Lender (Titan).[1] Amazingly, the Debtor argues in the

---

[1] Additionally, the Debtor's proposed law firm, Bernstein Shur Sawyer & Nelson, P.A., may also have connections to Titan or its affiliates. Lender intends to investigate any such connections upon the Bernstein's firm's disinterestedness disclosures through a presumably forthcoming application under Bankruptcy Code § 327.

DIP Motion that "the DIP Lender should be deemed a good-faith lender," and Debtor's proposed interim order contains a finding that "[t]he terms of the DIP Facility were negotiated in good faith" and "[e]ach of the Debtor and DIP Lender has acted in good faith[.]" This is all without any disclosure whatsoever that the DIP Lender is a close insider of the Debtor.

Although Lender's investigation has only just begun, it appears that the April 2025 Quit Claim Deed for the Real Property is void or voidable by Cumberland and/or Cumberland's creditors. It also appears likely that those transfers would lead to significant litigation claims against the individuals who participated therein. In any event, at this time, the Motion should be summarily denied in its entirely, or, at minimum, the Court should decline to enter any interim relief, and set a final evidentiary hearing after limited discovery.

## BACKGROUND

A.  **The Loan and the Property**

1. The terms and conditions of the Cumberland's borrowing relationship with Builder's Capital are set forth in that certain Loan Agreement (the "**Loan Agreement**") dated August 30, 2023, and executed by Cumberland.

2. Lender is the owner and holder of a Promissory Note (the "**Note**") dated as of August 30, 2023, in the original maximum aggregate principal amount of $17,884,362.12, the maker of which is Borrower.

3. The Loan is secured by, among other things, a Mortgage, Security Agreement, Assignment of Leases and Rents, Assignment of Contracts and Plans, and Fixture Filing, dated as August 30, 2023, and recorded on September 19, 2023, with the Cumberland County Register of Deeds on September 19, 2023, as Document No. 33423, at Book 40369, Page 250 (the "**Mortgage**"). The Mortgage encumbers Borrower's real property, improvements thereon and

personal property, with a street address of 100 U.S. Route 1 a/k/a 102 U.S. Route 1 a/k/a 98-102 U.S. Route 1, Cumberland, Maine (as more particularly described in the Mortgage, collectively, the "**Property**").

4. The Property is a 45-unit unoccupied condominium construction project.

**B.    Titan's Subordination to Builder's Capital**

5. Contemporaneous with the Loan, Cumberland also entered into a junior priority secured loan with Titan Funding, LLC ("**Titan**" and the "**Titan Loan**").

6. Titan is the proposed DIP lender.

7. To memorialize the junior priority of the Titan Loan, Titan signed a Subordination and Intercreditor Agreement (the "**Titan SIA**") dated August 30, 2023, and recorded on September 19, 2023, in Cumberland County.

8. Pursuant to the Titan SIA, Titan agreed (without limitation) that (i) the Titan Loan would be junior in all respects to the Loan Agreement, (ii) Titan would not exercise any of its enforcement remedies without Builder's Capital's prior written consent, and (iii) Titan would not in any way participate in the commencement of a bankruptcy proceeding by Cumberland.

9. The Titan SIA is signed by Edward Piazza as President of Titan.

10. The corporate resolution authorizing Debtor to file bankruptcy is signed by Edward Piazza.

**C.    The Loan Defaults**

11. Borrower defaulted under the Loan Documents due to Borrower's failure to make the monthly payments of debt service and other amounts (the "**Payment Default**"), and Borrower's failure to obtain Lender's approval prior to making changes to the Plans and

Specification of the Project (the "**Approval Default**").

12. By letter dated November 1, 2024 (the "**Notice of Default**") Lender notified Borrower and Mark McClure ("**Guarantor")** of Borrower's defaults under the Loan Documents due to the Payment Default and Approval Default.

13. Borrower failed to cure as demanded in the Notice of Default and remains in default.

14. Additionally, subsequent to the delivery of the Notice of Default, Borrower failed to repay the entire indebtedness in full on or before November 22, 2024 (the **"Maturity Date"**), which failure constitutes an additional Event of Default under the Loan Documents (the "Maturity Default").

15. Under the terms of the Loan Documents, Borrower is also required to furnish to Lender all reasonably available information concerning the condition of Borrower, Guarantor, and their current operations, including balance sheets and income statements and such other financial information (the "**Financial Information**") at such reasonable times as Lender may require, but in on instance less often then annually.

16. By letter dated January 14, 2025 (the "**Notice of Maturity Default**") Lender reiterated Borrower and Guarantor of Borrower's defaults under the Loan Documents due to the Payment Default and Approval Default, notified Borrower and Guarantor of the Maturity Default, and requested the Financial Information.

17. Borrower failed to provide the Financial Information to Lender when requested, thus constituting an additional Event of Default under the Loan Documents (the "**Financial Information Default**," collectively with the Payment Default, the Approval Default, and the Maturity Default, the "**Existing Defaults**").

18. Additionally, Borrower left the Property without a property manager, shut off water to the Property, and has failed to pay its electric bill, raising the risk that electricity to the Property will be shut off at any moment.

19. Borrower also failed to provide requested information regarding operations at the Property and allowed the filing of liens and encumbrances on the subject real estate and related collateral.

20. Moreover, the construction project at the Property remains unfinished, and Borrower lacks the resources to complete the remaining work that the construction project requires.

21. As of March 3, 2025, the following amounts were due and owing to Lender by Borrower under the Loan Documents: principal in the amount of $20,111,432.34, plus non-default interest, default interest, late fees, an exit fee, advances, legal expenses, and other amounts due under the Loan Documents.

**D.    Builder's Capital's Enforcement Actions**

22. As a result of the Events of Default, and in response to Lender being sued by the general contractor for the project at the Property, DeStefano & Associates, Inc., as a party-in-interest as part of the general contractor's enforcement of its alleged mechanic's lien (the "State Court Action"), on March 5, 2025, Lender filed an action for damages against Borrower, for the appointment of a receiver, and for a declaratory judgment declaring that Lender's lien on the Property is a first-priority lien, prior and superior to any interest of any other party.

23. On March 7, 2025, due to the above-enumerated issues with Borrower and the Property, Lender filed a motion for the appointment of a receiver in the State Court Action.

24. On April 14, 2025, counsel for an affiliate of Titan, informed Lender's counsel that

the Property had been transferred to a new entity that was planning on filing for bankruptcy as soon as that same day in the event that a receiver was appointed at a hearing in the State Court Action scheduled for April 14, 2025. A receiver was not appointed at the hearing due to the objections of one of the mechanic's lien holders, Hancock (who is represented by the same law firm that is representing Titan and/or its affiliates).

25. On April 18, 2025, the judge in the State Court Action issued an order providing that Lender's motion for receiver would be granted, but that Lender and Hancock should try to resolve Hancock's objection regarding language in the proposed receiver order so that a receiver could be formally appointed. Otherwise, Lender and Hancock were to submit competing proposed receiver orders for final decision by the judge appointing a receiver on April 22, 2025.

26. On April 22, 2025, given that Lender and Hancock were not able to resolve their differences as to the language in the proposed receiver order, Lender re-filed its proposed receiver order in the State Court for final decision.

E.    **Debtor's Pre-Petition Real Property Transfer**

27. The Debtor, Mark Real Estate Holdings, LLC, was formed as a Maine LLC on March 19, 2025. Proposed counsel for the Debtor, as debtor-in-possession, is the same law firm serving as the Debtor's registered agent.

28. Debtor's sole member is Titan Funding Holdings 1, LLC ("**Titan Holdings**"). Titan Holdings was formed as a Florida LLC on March 19, 2025, the same day Debtor was formed in Maine. The sole manager of Titan Holdings is Titan. The President of Titan is Edward Piazza.

29. On the same day Debtor was founded, which is also the same day Titan Holdings was formed, i.e. March 19, 2025, Edward Piazza executed a corporate resolution on behalf of Titan Holdings authorizing Debtor to file bankruptcy. At that time, upon information and belief, Debtor

owned no property and held no debts.

30. Twenty-two days later, on April 3, 2025, Cumberland executed a Quit Claim Deed ("**Quit Claim Deed**") purporting to transfer all of the Real Property to Debtor.[2] Lender did not learn of the Real Property transfer until later April 14, 2025, when it was so informed by counsel for a mechanic's lien claimant.

31. Then, on April 22, 2025, the same day Lender re-filed its proposed receivership order, and without prior notice to Lender, Debtor filed its petition initiating the instant bankruptcy action, pursuant to the corporate resolution executed by Edward Piazza nearly one month earlier. Edward Piazza's signature on the Petition is dated April 12, 2025, and Debtors' attorney's signature is dated April 18, 2025.

32. As to the specific timing, the Quitclaim Deed bears a recording stamp indicating a recording time of 8:05 a.m. on April 22. The instant bankruptcy petition was filed 3 hours and 50 minutes later, at 11:55 a.m. on April 22.

33. The following timeline summarizes the sequence of events:

| Date | Event |
| --- | --- |
| 8/23/2023 | Cumberland executes Loan Agreement and Mortgage |
| 8/23/2023 | Titan executes the SIA |
| 11/1/2024 | Lender issues Notice of Default |
| 11/22/2024 | Loan matures |
| 3/5/2025 | Lender files complaint against Cumberland |

---

[2] At this time, the available evidence indicates the Quit Claim Deed is void or voidable by Cumberland or its creditors as a fraudulent transfer. It does not appear Cumberland, which was insolvent, received reasonably equivalent value for the Quit Claim Deed. Lender's investigation will also explore whether the Quit Claim Deed was part of a scheme to hinder, delay, or defraud Cumberland's creditors.

| | |
|---|---|
| 3/7/2025 | Lender files motion for appointment of a receiver |
| 3/19/2025 | Edward Piazza forms Debtor and Titan Holdings |
| 3/19/2025 | Edward Piazza signs corporate resolution authorizing Debtor's bankruptcy filing |
| 4/3/2025 | Cumberland signs Quit Claim Deed transferring real property to Debtor |
| 4/12/2025 | Edward Piazza signs Debtor's bankruptcy petition |
| 4/14/2025 | Lender first learns of real property transfer |
| 4/18/2025 | State Court issues order granting motion for receiver |
| 4/18/2025 | Adam Prescott, Esq., signs Debtor's bankruptcy petition as its proposed counsel |
| 4/22/2025 | Lender re-submits proposed order appointing receiver |
| 4/22/2025 8:05 a.m. | Edward Piazza causes Quitclaim Deed to be recorded |
| 4/22/2025 11:55 a.m. | Edward Piazza files Debtor's bankruptcy petition |

F.   **The Proposed DIP Loan**

34.   Debtor filed the Motion on April 23, 2025, the first full day of its bankruptcy case.

35.   The Motion seeks interim and final orders authorizing the Debtor to enter into post-petition secured financing with Titan, up to an amount of $2,725,000 ("**DIP Loan**"). The Motion includes a proposed DIP Loan Budget ("**Budget**") purporting to show the intended uses of the DIP Loan.

36.   The interest rate on the DIP Loan is 12%.

37.   On an interim basis, the Debtor requests authority to borrow up to $200,000 ("**Interim Funding Request**"), pending consideration of the entry of a final order. Pursuant to the DIP Loan Term Sheet attached as Exhibit 1 to the Motion, the Interim Funding Request would be secured by an unavoidable lien *pari passu* with Titan's existing secured claim against the Property.

Upon entry of a final order granting the Motion, the Interim Funding Request would be converted to a first-priority post-petition lien on the Real Property. All future borrowings under the DIP Loan would also be secured by first-priority post-petition liens on the Real Property as well.

38. According to the Budget, of the $200,000 Interim Funding Request, only $125,000 should be drawn prior to May 18, at the earliest. Of this amount, $25,000 would go towards "New Construction/Building Costs." Another $25,000 is earmarked for "Marketing/Rebranding". Neither of these line items, constituting 40% of the Interim Funding Request, have any explanation or breakdown of the expenditures, nor does the Motion.

39. An amount of $11,250 would be used for real property taxes, which of course Cumberland should have timely paid from existing sources. Debtor then seeks to borrow $25,000 to pay its proposed counsel for the first three-weeks of legal services in this case.

40. Of the entire $125,000 interim budget request, only $17,236 is proposed to be spent on actual expenses needed to preserve, maintain, and protect the Property. Upon information and belief, the Property is uninsured, lacks any physical security or surveillance, may not have an operational fire safety system, and may have already been denied utility services. Lender agrees these are immediate and urgent needs, but, as argued hereinbelow, the Debtor has neither the capacity nor the competence to perform even the most basic responsibilities of property ownership, even with sufficient funding.

41. A remaining balance of $16,514 would be retained as cash on hand from the Interim Funding Request, for an undisclosed purpose. The interim budget also proposes to maintain a $5,000 per month reserve.

42. The Motion does not explain why the Debtor requests authority to borrow up to $200,000 during the interim period where it has only identified a purportedly "urgent" need for

$108,486.

### G. Payment of Mechanics' Liens

43. If the Motion proceeds to a final hearing, the Debtor proposes to borrow a total of at least $2,300,000 within the first four weeks of this bankruptcy case. Of that amount, Debtor proposes to pay $2,142,800, or 78% of the total DIP Loan amount, towards "Mechanic's Lien Payoffs."

44. Prior to learning of the instant bankruptcy action, Lender was prepared to make payments to settle any and all mechanic's lien claims brought against the Property (the "**Mechanics' Lien Settlement Amount**"), as evidenced by a certain Payment and Lien Release Agreement executed by Lender (the "**Mechanics' Lien Settlement Agreement**").

45. Lender had agreed that it would pay the Settlement Amount by 3 PM (EST) on April 23, 2025. Lender had obtained internal approval for payment of the Settlement Amount and had executed the Settlement Agreement.

46. On the morning of April 23, 2025, when Lender learned for certain that Cumberland had transferred the Property to Debtor, and that Debtor had filed the instant bankruptcy, Lender paused the payment of the Mechanics' Lien Settlement Amount pending further proceedings in this Court.

47. As of the filing of this Objection, Lender is finalizing a new agreement with the Debtor and other relevant parties that would allow consummation of the Mechanics' Lien Settlement Agreement, or a similar agreement, to move forward. This will result in full payment by Lender of the Mechanics' Lien Settlement Amounts, in satisfaction of those secured claims. As a result of Lender's proactive and expedited actions, 78% of the DIP Loan Funding request should imminently become moot.

**ARGUMENT**

I.  **Objections to Interim Relief**

48. First, the Motion utterly fails to set forth (without limitation) any (i) disclosure of the close insider relationship between the Debtor and the DIP Lender, (ii) meaningful explanation or justification for the pre-petition transfer of the Real Property, and (iii) discussion of the apparent voidability of that transfer and the effect such avoidance could have on the DIP Loan. This is especially troubling where the insider DIP Lender would charge 12% interest, starting immediately, on non-emergency expenditures.

49. Second, as to use of the DIP Loan proceeds during the interim period, the Motion does not propose any specific use, or explain any urgent need in the first 21-days of this case for (without limitation), (i) $25,000 of unspecified "Marketing/Rebranding" expenses, (ii) $25,000 of unspecified "New Construction" costs, (iii) $16,514 of excess loan proceeds (which are not even contemplated to be expended in the interim budget period), (iv) $22,236 for purported operating expenses, without disclosing the timing of these payments or whether they are pre-petition or post-petition payables, or (v) $25,000 for Debtor's proposed counsel, in the first 21-days of this case, before such counsel has even filed an application seeking approval of its engagement addressing its disinterestedness or lack thereof. Debtor has failed to show that any of these expenditures are necessary to avoid immediate and irreparable harm in the first 21 days of this case. *See* Fed. R. Bankr. P. 6004.

50. Lender acknowledges that $17,236 of the proposed interim budget categories address property preservation, maintenance, and safety issues which require immediate attention. However, these needs do not in themselves evidence that this Debtor and its conflicted insiders are in any position to perform those tasks. It is inexplicable that Debtor (or Cumberland) allowed these

property preservation issues to arise, and that in the face of those dangers, that Cumberland and Debtor were prioritizing creditor hindrance over property preservation. If the Court denies the Motion, as it should, Lender is exploring all available options to stabilize, protect, and preserve its collateral.

51. Third, even if certain expenses are immediately necessary, Debtor's failure to provide details on the amount calculations, the timing of payments, and the proposed repayment schedule results in an unjustified, unnecessary, and indeterminate accrual of 12% interest.

52. Finally, the emergency basis on which the Debtor filed the Motion prevents Lender and all other parties in interest, including the United States Trustee, from investigating and evaluating the circumstances of the DIP Loan, the nature of Edward Piazza's negotiations with himself as both the DIP Lender's and Debtor's representative, or any other facts relevant to Debtor's allegations of good faith. There are more than sufficient facts to set out a *prima facie* case that the Debtor and DIP Lender are not in good faith.

53. For all these reasons, Lender would be greatly prejudiced by entry of an interim order on the Motion, notwithstanding that the proposed interim lending would be a junior encumbrance. Such an interim order, as proposed by the Debtor, would improperly sanctify a highly suspicious transaction, while giving additional enforcement rights to a lender engaged in dodgy self-dealing.

## II. Initial Objections to Final Relief

54. First, through the Mechanics' Lien Settlement Agreement, Lender intends to and will satisfy the mechanics' lien claims. Payment of those claims constitutes 78% of the total DIP Loan. That request is moot.

55. Second, due to the Debtor's presentation of the Motion as a purported "emergency,"

Lender has just begun a comprehensive investigation of the circumstances of the Motion and this case. Lender's strong expectation is that its investigation will not only confirm the facts as Lender presently understand them, but considering the nature of those facts, will uncover other and presently unknown indicia of fraud and/or bad faith.

56. Given the gross insufficiency of the Debtor's disclosures, together with the substantial indicia of bad faith, and because 78% of the funding requested in the Motion will imminently become moot, it is in the best interests of Lender and creditors that the Court summarily deny the Motion on a final basis at this time.

## CONCLUSION

Of the $125,000 Debtor seeks to borrow on an interim basis, merely $17,236 has anything to do with stabilization, maintenance, and preservation of the Property. Although these expenses may be immediately necessary, Debtor, which has owned the property for less than one month, is simply too conflicted, untrustworthy, and ineffectual, to perform the necessary remedial measures. Instead, Lender intends to promptly seek appointment of a Chapter 11 Trustee on an emergency basis through a forthcoming motion.

## RESERVATION OF RIGHTS

Due to the timing and circumstances of the Motion, this objection is intended only as Builder's Capital's *initial* objection to the Motion. Builder's Capital expressly reserves all objections, argument, or rights of any nature with respect to the Motion, to be raised at or prior to a final evidentiary hearing. Builder's Capital further reserves all of its rights to seek dismissal of this bankruptcy case as a bad faith filing, relief from the automatic stay, conversion to Chapter 7, or appointment of a Chapter 11 Trustee.

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | */s/ Joan B. Egdall* |
|  | Joan B. Egdall (ME#9490) |
|  | Demerle & Associates, P.C. |
|  | 10 City Square, 4th Floor |
|  | Boston, MA 02129 |
|  | (617) 337-4444 |
|  | (617) 337-4496 (fax) |
| DATE:  April 28, 2025 | Bankruptcy@demerlepc.com |

## CERTIFICATE OF SERVICE

I, Joan B. Egdall, Esq. of the law firm of Demerle & Associates, P.C., hereby certify that I have this 28th day of April, 2025 served on behalf of Builders Capital Finance, LLC an <u>Initial Objection to Motion of Debtor</u> and this <u>Certificate of Service</u> by causing copies hereof to be sent to all parties of record by electronic mail via the Case Management / Electronic Case Files (ECF) system.

| | |
|---|---|
| U.S. Trustee<br>Office of U.S. Trustee<br>537 Congress Street, Suite 300<br>Portland, ME 04101 (ECF) | Adam R. Prescott, Esq.<br>Bernstein Shur Sawyer & Nelson, PA<br>100 Middle Street<br>PO Box 9729<br>Portland, ME 04104 (ECF) |
| David Perkins, Esq.<br>Curtis Thaxter LLC<br>One Canal Plaza, Suite 1000<br>P.O. Box 7320<br>Portland, ME 04112-7320 (ECF) | Stephen G. Morrell, Esq.<br>Office of the U.S. Trustee<br>537 Congress Street<br>Portland, ME 04101 (ECF) |
| Bodie B. Colwell, Esq.<br>PretiFlaherty<br>One City Center<br>PO Box 9546<br>Portland, ME 04112 (ECF) | Kellie W. Fisher, Esq.<br>Drummond Woodsum<br>84 Marginal Way, Suite 600<br>Portland, ME 04101 (ECF) |
| Aaron P. Burns, Esq.<br>Pearce, Dow & Burns, LLP<br>2 Monument Sq, Ste 901<br>P.O. Box 108<br>Portland, ME 04112 (ECF) | |

*/s/ Joan B. Egdall*

Joan B. Egdall, Esq.