**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| In re: | Chapter 11 |
| The Mark Real Estate Holdings, LLC | Case No. 25-20100 |
| Debtor.[1] | |

**SUPPLEMENTAL OBJECTION OF BUILDERS CAPITAL FINANCE, LLC TO MOTION OF DEBTOR FOR ENTRY OF A FINAL ORDER (I) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION FINANCING PURSUANT TO § 364 OF THE BANKRUPTCY CODE; (II) AUTHORIZING THE USE OF CASH COLLATERAL; AND (III) GRANTING LIENS AND SUPER-PRIORITY CLAIMS**

BUILDERS CAPITAL FINANCE, LLC ("**Builders Capital**" or the "**Lender**"), by and through undersigned counsel, files this supplemental Objection (the "**Objection**") to the *Motion of Debtor for Entry of a Final Order: (I) Authorizing Debtor to Obtain Postpetition Financing Pursuant to § 364 of the Bankruptcy Code; (II) Authorizing the Use of Cash Collateral; (III) Granting Liens and Superior Priority Claims* (the "**Motion**") [Dkt. No. 8] filed by The Mark Real Estate Holdings, LLC (the "**Debtor**"). In opposition to the Motion, Builders Capital respectfully states as follows:

**PRELIMINARY STATEMENT**

1.     This case works only if the Court is prepared to accept Titan's[2] invitation to elevate form over substance and allow Titan to engage in a scheme engineered to take control of Builders Capital's collateral over Builders Capital's vociferous objections and in direct violation of the Titan

---

[1]     The Mark Real Estate Holdings, LLC's principal place of business is 100 US Route 1, Cumberland, Maine 04021, and the last four digits of its taxpayer identification number are 8757.

[2]     Builders Capital files this Objection as a supplement to the initial objection filed by Builders Capital on April 28, 2025 (the "**Initial Objection**") [Dkt. No. 23]. As a result, Builders Capital assumes familiarity with the Initial Objection and the factual background set forth by Builders Capital therein. Further, capitalized terms used and not defined herein shall have the meanings ascribed to such terms in the Initial Objection.

SIA.  Through the Titan SIA, Titan contracted with Builders Capital to trade away any right it may have to take control over the Property or to commence or cooperate in a bankruptcy proceeding with respect to the Property until such time as Builders Capital is paid in full.  For the Court to grant any relief in this proceeding, it must be willing to accept the notion that Titan can solve this inherent problem with the fig leaf of a freshly formed entity—the Debtor—that is being directed by Titan to do all of the things that Titan lacks the capacity to do.  The net effect of what the Court is asked to do is to violate the primacy of the Titan SIA and permit Titan to enhance its recovery at the expense of Builders Capital, despite Titan's obligations mandating otherwise.

2.     With respect to the specific relief sought by the Motion, Builders Capital submits that the Motion must be denied for the following reasons.  *First*, this chapter 11 case and the Debtor's very existence are the result of inappropriate and unauthorized control by Titan over the Debtor and the Property.  By virtue of the Titan SIA, Builders Capital has serious doubts as to whether the Property is property of the bankruptcy estate, because Titan is required to hold the Property or an interest in it for Builders Capital's benefit, and whether Titan or the Debtor are able to take any position in this proceeding or had authority to file this case.  *Second*, the Motion also fails to meet the technical requirements for financing under section 364(d) of the Bankruptcy Code.  Among other things, the Debtor has failed to demonstrate that it is unable to obtain credit on terms more favorable than the proposed DIP financing and has failed to show that Builders Capital will be adequately protected if the DIP financing is approved.  In fact, the Debtor is entirely unable to offer adequate protection of Builders Capital's interest in this case and has repeatedly left the Property without certain utilities (and, therefore, risking protection of the Property).  *Finally*, the Court must decline to grant Titan safe harbor protections as a good faith lender under section 364(e) of

2

the Bankruptcy Code.  Based on Titan's orchestration of this case and numerous and blatant violations of the Titan SIA, such relief is entirely unwarranted.

## BACKGROUND

1.      As noted by Builders Capital in the Initial Objection, the Debtor (The Mark Real Estate Holdings, LLC), was formed as a Maine LLC on March 19, 2025.  Titan did not inform Builders Capital of the Debtor's formation.  A copy of the Limited Liability Company Agreement of the Debtor is attached hereto as **Exhibit A** (the "**Operating Agreement**").

2.      Paragraph 1.1 of the Operating Agreement provides that "[t]he [Debtor] shall be formed upon the execution of this Agreement and the filing of a Certificate of Formation of the Company with the Secretary of State of the State of Maine."  A copy of the Debtor's Limited Liability Company Certificate of Formation, which was filed with the Secretary of State of the State of Maine on March 19, 2025, is attached hereto as **Exhibit B** (the "**Certificate of Formation**").  An attorney with the firm proposed as the Debtor's counsel is listed on the Certificate of Formation as the "Authorized Person" who made the filing.

3.      On April 3, 2025,[3] unbeknownst to Builders Capital, the Debtor entered into an Asset Purchase Agreement, attached hereto as **Exhibit C** (the "**APA**") with Builders Capital's original borrower, Cumberland, to purportedly transfer the Property from Cumberland to the Debtor.

4.      The recitals to the APA indicate that Titan engineered the purported transfer of the Property for its own benefit and in response to the initiation of legal proceedings to foreclose on

---

[3]      The preamble of the APA reflects that the date of the APA is April 11, 2025.  However, the metadata of the APA file that was provided to Builders Capital reflects that the file was created on April 4, 2025 and that the April 11 date in the preamble was added at a later date.  This is consistent with the quitclaim deed purporting to transfer the Property to the Debtor, which is included with the APA as Exhibit A and was signed by Mark McClure on April 4, 2025.

the Property, by virtue of which Titan perceived a risk that it would not be repaid.  As noted in the Initial Objection, Builders Capital commenced an action for damages against Cumberland on March 5, 2025, and sought the appointment of a receiver to take control of Cumberland and the Property.  Therefore, per the APA's recitals, Titan created the Debtor and proposed the transfer of the Property to the Debtor to "protect [Titan's] interests" and to "directly benefit[] [Titan]."

5.      The APA provides, among other things, that the consideration for the transfer was: (i) the assumption of liabilities by the Debtor, (ii) an agreement for back-end sharing of proceeds between Titan and Mark McClure, and (iii) grant of releases to Mark McClure.

6.      Pursuant to paragraph 5.4 of the APA, the Debtor has the option to cancel and unwind the purported transfer of the Property within 90 days of the closing under the APA.

7.      The Debtor filed the Motion on April 23, 2025 - the first full day of its bankruptcy case.

8.      Through the Motion, the Debtor sought interim and final orders authorizing the Debtor to enter into post-petition secured financing with Titan Funding, LLC ("**Titan**") up to an amount of $2,725,000.00 (the "**DIP Loan**"). The Motion included a proposed DIP Loan Budget (the "**Prior Budget**") [Dkt. No. 8-3] purporting to show the intended uses of the DIP Loan.  The proposed interest rate on the DIP Loan is 12.0%.

9.      On an interim basis, the Debtor requested authority to borrow up to $200,000.00 (the "**Interim Funding Request**"), pending consideration of a final order.  Pursuant to the DIP Loan Term Sheet attached as Exhibit 1 to the Motion, the Interim Funding Request was to be secured by an unavoidable lien *pari passu* with Titan's existing secured claim against the real property, improvements thereon and personal property, with a street address of 100 U.S. Route 1 a/k/a 102 U.S. Route 1 a/k/a 98-102 U.S. Route 1, Cumberland, Maine, (as more particularly

4

described in Builders Capital's Mortgage, collectively, the "**Property**").  Upon entry of a final order granting the Motion, the Interim Funding Request would be converted to a first-priority post-petition lien on the Property.  All future borrowings under the DIP Loan would also be secured by first-priority post-petition liens on the Property as well.  By virtue of this, the Debtor and Titan seek to prime Builders Capital's existing first-priority lien on the Property.

10.     On April 28, 2025, Builders Capital filed its Initial Objection to the Motion, in which it expressed its concerns that the interim requests for DIP financing were, with limited exceptions, unjustifiable, unnecessary, and harmful to Builders Capital and other creditors.  Builders Capital also pointed out that the Debtor failed to disclose that it was a closely held affiliate of the proposed DIP Lender, Titan, and that the Quit Claim Deed transferring the Property to the Debtor appeared to be void or voidable.  For these reasons, and others, Builders Capital requested that the interim and final relief for DIP financing be denied.

11.     Following a hearing on April 29, 2025, at which Builders Capital and other creditors objected to the Motion, the Court required the Debtor to limit the proposed interim expenditures to only those that were immediate and urgent to maintain the Property.

12.     The Debtor submitted a revised proposed interim order, which the Court entered on April 30, 2025, allowing disbursements of $15,236.00 for immediate and urgent needs (the "**Interim Funding**"), and scheduling a final hearing on the Motion for May 13, 2025, with objections due by May 9, 2025, for the remainder of the proposed DIP financing. [Dkt. No. 35].  The Court continued the final hearing to May 20, 2025, with objections due by May 16, 2025.  [Dkt. Nos. 65, 66].  The Court again continued the final hearing to May 29, 2025, with objections due by May 23, 2025.  [Dkt. Nos. 74, 77].

13.     On May 2, 2025, Builders Capital paid certain mechanic's liens, rendering

$2,500,186.00 (or 91%) of the originally proposed total DIP loan amount unnecessary.

14.     On May 6, 2025, Debtor filed a revised proposed final order (the "**Proposed Final Order**") [Dkt. No. 55] and budget (the "**Proposed Final Budget**") [Dkt. No. 55, Exh. A], seeking approval of $520,236.00 in DIP Loan advances (the "**Proposed Final Funding Request**") specifically (A) $125,000.00 for legal fees; (B) $200,000.00 for new construction costs; (C) $45,000.00 for payment of real property taxes; (D) $50,000.00 for marketing/rebranding; (E) $20,000.00 for miscellaneous/reserve, (F) $8,000.00 for landscaping; (G) $22,176.00 for U.S. Trustee fees (H) $8,808.00 for electricity; (I) $13,500.00 for insurance; (J) $10,500.00 for property management; (K) $4,500.00 for security; and (L) $3,000.00 for gas, with payments projected to be made through August 2, 2025.  A remaining balance of $6,395.00 would be retained as cash on hand from the Proposed Final Funding Request.

15.     Also on May 6, 2025, the Debtor filed its Schedules of Assets and Liabilities (the "**Schedules**") and Statement of Financial Affairs (the "**Statements**") [Dkt. No. 57].  The Debtor's Schedules and Statements were signed by Edward Piazza as the manager of the Debtor.  In its Schedules, the Debtor scheduled the Property as its sole asset and provided a value for the Property of $15,000,000.00.  [Dkt. No. 57, Schedule A/B, Part 9].  Further, the Debtor scheduled Builders Capital with a claim of $20,111,732.34[4] secured by a lien on the Property.  *Id*., Schedule D, Part 1.  The only other secured claims scheduled by the Debtor are the mechanic's liens which have now been satisfied by Builders Capital.  *Id*.  Titan is scheduled by the Debtor as holding a nonpriority, unsecured claim in the amount of $6,694,650.00 and no secured claims.  *Id*., Schedule E/F, Part 2.

---

[4]     The Debtor additionally marked Builders Capital's claim as "disputed."  Builders Capital is not aware of the Debtor's basis for disputing its claim, none having been communicated to Builders Capital by the Debtor or, prior to the transfer of the Property and commencement of this case, Cumberland.  Furthermore, Builders Capital is aware of no basis for the Debtor to object to validity, priority, or extent of Builders Capital's security interest in the Property.

16.     Subsequently, on May 21, 2025, Builders Capital was informed by its insurance broker via email that obtaining forced placed insurance in was impracticable due to the Property's current condition.  Specifically, Builders Capital was told that "With there being no protections in place, no power/water, and no real plans for the property, [the insurance companies] only feel comfortable offering a $2.5M primary for $207k (plus tax/fees) with a $100k all other perils deductible and 3% w/h with a 75% minimum earned premium for the property coverage."

## ARGUMENT

17.     Builders Capital has stated its initial concerns with the Motion in its Initial Objection, and expressly incorporates all objections and arguments raised in the Initial Objection herein. *See* [Dkt. No. 23] (discussing (without limitation) the lack of any (i) disclosure of the close insider relationship between the Debtor and the DIP Lender, (ii) meaningful explanation or justification for the pre-petition transfer of the Real Property, and (iii) discussion of the apparent voidability of that transfer and the effect such avoidance could have on the DIP Loan).

18.     In addition to those bases raised in the Initial Objection, Builders Capital respectfully requests that the Court deny the relief sought by the Motion for the following reasons:

**I.      The DIP Facility Is Not A Sound Or Fair Exercise Of The Debtor's Judgment.**

19.     Although each specific term of the proposed financing warrants careful, individual scrutiny by the Court and all affected parties, it is also important to step back and consider the nature of the proposed financing in the greater context of the troubling events and circumstances that led to this chapter 11 case being filed in the first instance.

20.     It is beyond reproach that the DIP Facility is an insider transaction that must be subject to heightened scrutiny given the fact that the Debtor is a closely held affiliate of the DIP Lender.  What is more, one individual, Edward Piazza, by all auspices appears to be in control of

both the Debtor and the DIP Lender. *See Initial Objection*, p. 2 (detailing Edward Piazza's numerous decision-making roles with respect to the Debtor, DIP Lender, and Titan). Most concerningly, Titan and Edward Piazza appear to be the engineers of the transaction that purportedly transferred the Property, Builders Capital's collateral, to the Debtor on the eve of filing and without Builders Capital's knowledge or consent. Builders Capital continues to hold the strong belief that the transfer of the Property to the Debtor was likely a fraudulent transfer (or a common law equivalent) intended to hinder and delay Builders Capital's legitimate and continuing enforcement activities and, therefore, can and should be unwound or subject to other protective remedies.[5] Finally, based on Titan's entry into the Titan SIA and agreement to, among other things, subordinate its debts and refrain from a panoply of activities without Builders Capital's express written consent, Builders Capital further doubts whether Titan had and continues to have the authority to direct the filing of this chapter 11 case, to direct the Debtor to take *any* action in the case (including to encumber the Property), and indeed whether the Property is even properly property of the Debtor's bankruptcy estate. For these reasons, Builders Capital, fundamentally, questions whether the Court can grant the relief sought by the Motion and whether any relief would provide any utility to any party in interest (other than Titan).

21.     Courts in the First Circuit apply heightened scrutiny to transactions involving insiders. *In re 604 Columbus Ave. Realty Tr.*, 968 F.2d 1332, 1360 (1st Cir. 1992) ("Claims arising from dealings between a debtor and an insider are rigorously scrutinized by the courts"); *In re Moultonborough Hotel Grp., LLC*, No. BR 10-14214-JMD, 2012 WL 5464630, at *9 (Bankr. D.N.H. Nov. 8, 2012) (release of claims of an insider "requires stricter scrutiny"). Courts apply this heightened scrutiny in equal force to DIP financing transactions between a debtor and an

---

[5]     Builders Capital's investigation of this transfer remains ongoing, and Builders Capital reserves all rights to pursue remedies with respect to the transfer.

insider. *See In re Beverages Int'l Ltd.*, 50 B.R. 273, 282 (Bankr. D. Mass. 1985); *In re Latam Airlines Grp.* S.A., 620 B.R. 722, 769 (Bankr. S.D.N.Y. 2020) (applying heightened scrutiny to DIP financing where DIP lender was an insider); *In re Lafayette Hotel P'ship*, 227 B.R. 445, 454 (S.D.N.Y. 1998), aff'd, 198 F.3d 234 (2d Cir. 1999) ("[S]ince there is an incentive and opportunity to take advantage, dominant shareholders' and other insiders' loans in a bankruptcy must be subject to rigorous scrutiny"). "An insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor." *In re Emerson*, 244 B.R. 1, 31–32 (Bankr. D.N.H. 1999) (quoting S.Rep. No. 989, 95th Cong., 2d Sess. 25 (1978), U.S.Code Cong. & Admin. News pp. 5787, 5810; H. Rep. No. 595, 95th Cong., 1st Sess. 312 (1977), U.S.Code Cong. & Admin. News pp. 5963, 6269).

22. This case perfectly highlights why heightened scrutiny must be applied to insider transactions. It is not remotely apparent how the Debtor, given its connections to and control by Titan, could ever exercise independent business judgment in a manner that respects the fiduciary duties owed by a bankrupt debtor to its estate over the individual interests of its creditors. There is clear incentive in this case for Titan – who engineered the formation of the Debtor and transfer of the Property from Cumberland, *all while hiding its actions from Builders Capital while Builders Capital pursued alternative remedies* – to use its control over the Debtor to improve its position and recovery at Builders Capital's expense and in clear and continuing violation of the Titan SIA.

23. In enacting section 510(a) of the Bankruptcy Code, Congress codified the concept that agreements governing the relationships between creditors should be enforceable within bankruptcy to the same extent as outside it. See, e.g., *HSBC Bank USA v. Branch (In re Bank of New England Corp.)*, 364 F.3d 355 (1st Cir. 2004) (noting that section 510(a) "supplants the judge-made doctrine through which the courts previously had dealt with" subordination agreements.).

Section 510(a) of the Bankruptcy Code provides that "[a] subordination agreement is enforceable [in bankruptcy] to the same extent that such agreement is enforceable under applicable nonbankruptcy law."  "A bankruptcy court, in order to effectuate its duty to do equity, must enforce lawful subordination agreements according to their terms and prevent junior creditors from receiving funds where they have explicitly agreed not to accept them."  *In re Credit Indus. Corp.*, 366 F.2d 402, 410 (2d Cir. 1966).  Moreover, "bankruptcy courts have jurisdiction to enforce" and interpret inter-creditor agreements in order to promote "an equitable resolution of the broader bankruptcy case" that cannot otherwise be achieved without a resolution of such inter-creditor disputes.  4 Collier on Bankruptcy ¶ 510.03 (16th ed. 2025)  (citing *In re Best Products Co., Inc.*, 168 B.R. 35, 64–65 (Bankr. S.D.N.Y. 1994)).

24.     The Titan SIA was executed on August 30, 2023.[6]  In broad strokes, Titan agreed, among other things, that: (i) the Titan Loan would be junior in all respects to the Loan Agreement, (ii) Titan would not exercise any enforcement remedies without Builders Capital's prior written consent, and (iii) Titan would not in any way participate in the commencement of a bankruptcy proceeding by Cumberland or involving Titan's junior indebtedness.  A copy of the Titan SIA is attached to this Objection as **Exhibit D**.  More specifically, the Titan SIA contains, among others, the following materially relevant provisions:[7]

(a)     **Paragraph 2: Debt Subordination, Restriction on Payment of Subordinate Indebtedness.**

i.     Titan agrees that its right to receive payment shall be subordinated to Builders Capital's right to receive payment.

---

[6]     Edward Piazza, the same Titan officer who is the manager of the Debtor, signed the Debtor's bankruptcy petition, signed the Debtor's Schedules and Statements, and presumably negotiated the proposed DIP financing on behalf of Titan and the Debtor, is a signatory to the Titan SIA on behalf of Titan.

[7]     Given the length of the Titan SIA and the numerous relevant provisions, the following is a summary of the relevant provisions of the Titan SIA.  Provisions relevant to the following summary are highlighted on Exhibit D.

ii. Further, until such time that Builders Capital is paid in full, Titan agrees that Cumberland shall not make any payment to Titan while Cumberland is in default. True and correct copies of notices of default provided to Cumberland on November 1, 2024, and January 14, 2025, are attached hereto as **Exhibit E** (the "**November Default Notice**") and **Exhibit F** (the "**January Maturity Default Notice**"), respectively. Each default notice was provided to Titan.[8]

iii. Finally, Titan agrees that any payments received in contravention of the foregoing shall be held in trust for the benefit of and promptly turned over to Builders Capital.

(b) **Paragraph 6.1 & 6.2**: **Standstill by Titan/Notice from Builders Capital/Stipulation to Receivership.**

i. Titan agrees that it shall not exercise any rights or remedies against the Property without the prior written consent of Builders Capital. Any exercise of any remedy shall be *void ab initio* and of no effect whatsoever.

ii. Builders Capital agrees that it shall consent to Titan's exercise of rights to foreclose on membership interests in Cumberland, so long as (i) Titan cures any then-outstanding defaults to Builders Capital; (ii) provides information regarding Titan's creditworthiness; and (iii) provides Builders Capital with one or more guarantors.

iii. Titan agrees that, after an event of default, it shall not oppose any request by Builders Capital for the appointment of a receiver for the Property.

(c) **Paragraph 7.1, 7.2 & 7.3**: **Notice and Cure Rights.**

i. Prior to commencing any enforcement actions, Builders Capital agrees to provide Titan with notice a default and to permit Titan an opportunity to cure such default. As noted, Titan received the November Default Notice and the January Maturity Default Notice from Builders Capital.

ii. Following receipt of a notice of default, Titan may elect to purchase and assume Builders Capital's debts for a price equal to the then-outstanding indebtedness.

iii. Upon occurrence of a default under its loan documents, Titan agrees to provide Builders Capital with a copy of a notice of default to Cumberland.

---

[8] Further, the January Maturity Default Notice was sent directly to Titan's bankruptcy counsel.

11

(d)   **Paragraph 9: Modification of Senior Loan and Subordinate Rights.**

i.   No delay by Builders Capital in enforcing its rights under its Loan Agreement, Mortgage, or the Titan SIA shall impair or adversely affect the rights of Builders Capital under the Titan SIA.

ii.   Further, modification or amendment of the Titan Loan is not permitted without Builders Capital's written consent, and Titan shall not sell, assign, transfer, pledge, encumber, hypothecate, or enter into participations for all or part of its interests in the Titan Loan or Titan's indebtedness with Builders Capital's written consent. Any attempted sale, transfer, pledge, encumbrance, hypothecation, or participation shall be void and of no force or effect.

(e)   **Paragraph 12: Actions in Bankruptcy.**

i.   Until Builders Capital is repaid in full, Titan shall not initiate or join in the filing of an involuntary chapter 11 petition, or the commencement of any other receivership, insolvency, liquidation, readjustment, reorganization, or similar proceeding against Cumberland or any guarantor of Builders Capital's indebtedness.

ii.   Further, Titan agrees that it will not make any election, give any consent, file any motion, or take any other action in any bankruptcy or insolvency with respect the Titan Loan to Titan's indebtedness without Builders Capital's prior written consent.

(f)   **Paragraph 13: Priority of Payments in Liquidation or Insolvency.**

i.   In the event of any insolvency proceeding, all amounts due to Builders Capital shall be paid in full before any payment is made to Titan. Further, any payment made to Titan in contravention of this section shall be held in trust for the benefit of Builders Capital and shall be paid by Titan to Builders Capital.

(g)   **Paragraph 14: Subrogation.**

i.   If Titan acquires any lien, estate, right, or other interest with respect to the property or assets of Cumberland or any guarantor of Builders Capital's indebtedness, then that lien, estate, right, or other interest shall be subordinate to Builders Capital and shall be held in trust by Titan for the benefit of Builders Capital.

(h)   **Paragraph 16: No Consent to Additional Subordinate Financing.**

i.   Builders Capital's consent to the Titan Loan to Cumberland relates solely to the Titan Loan, and does not constitute consent to any other encumbrances or liens on the Property or waiver of any of Builders

Capital's rights.

(i)    **Paragraph 18.1: Miscellaneous.**

    i.    The Titan SIA shall be binding upon the successors and assigns of Titan and Builders Capital.

25.    It is patently obvious that the course of transactions that led to this case—including (i) Titan's creation of the Debtor and installation of Titan Holdings as the Debtor's sole member and Edward Piazza as its manager, (ii) Titan's side deal with Cumberland and the Guarantor, leading to the APA (iii) the transfer of the Property to the Debtor, (iv) Titan's authorization of the Debtor to prepare and file a chapter 11 petition, and (v) Titan's self-dealing negotiation of the proposed DIP Loan, *all of which were performed in secrecy and without Builders Capital's knowledge or consent*—are flagrant and continuing violations of many provisions of the Titan SIA. Titan has deliberately run roughshod over the Titan SIA and, at best, has carefully and calculatedly structured its control of the Debtor and this case to dance around the edges of numerous Titan SIA provisions designed to protect Builders Capital's senior interests. The purpose and intention of Titan's conduct is clear: to improve its position at Builders Capital's expense by controlling and abusing the chapter 11 process to its own benefit.

26.    The recitals included in the APA, to which Titan is a party, confirm that Titan commandeered the Property to protect its own interests and elevate them above Builders Capital's interests, despite Builders Capital's ongoing state court enforcement efforts and in direct violation of the Titan SIA. Indeed, the recitals, which are reproduced below, confirm that Titan acted in response to the collection efforts of Builders Capital and other creditors, that Titan did so in its self-interest and based on a perception that Titan may not be repaid, and that Titan wished to protect its own interests without consideration of Builders Capital's senior interests or consultation of Builders Capital:

13

## RECITALS

**WHEREAS**, Seller owns certain assets, and holds various rights, related to a residential development complex in Cumberland, Maine, commonly known as "The Mark" (as further define below, "**Real Property**"); and

**WHEREAS**, Member is the sole Member of the Seller; and

**WHEREAS**, Lender lent money to Seller (the "**Loan**"), said Loan being secured by a mortgage on the Real Property (the "**Lender Mortgage**") and the personal guaranty of the Member (the "**Personal Guaranty**"); and

**WHEREAS**, creditors of the Seller are initiating legal proceedings to foreclose on the Real Property; and

**WHEREAS**, Lender believes there is a risk that it will not be repaid the amount due under the Loan either by the Seller or by virtue of the security provided by the Lender Mortgage; and

**WHEREAS**, Lender has created the Purchaser as an affiliated company in order to preserve the assets of the Seller and protect Lender's interests; and

**WHEREAS**, the Lender has proposed the transaction described below and has concluded that it directly benefits the Lender in that it protects the Lender's interests; and

**WHEREAS**, both the Member and the Seller desire to reduce their liability to the Lender and/or other creditors; and

**WHEREAS**, Purchaser desires to purchase substantially all of the assets of Seller, and to assume certain liabilities of Seller as set forth herein, and Seller desires to sell such assets to Purchaser and to assign such liabilities to Purchaser, and to have Purchaser assume the same as described herein, all on the terms and conditions set forth in this Agreement; and

**NOW THEREFORE**, in consideration of the mutual benefits to be derived from this Agreement and of the representations, warranties, conditions, agreements, and promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are acknowledged by the Parties, the Parties hereby agree as follows:

These recitals confirm that Titan's actions are an audacious violation of the Titan SIA.

27. Moreover, Titan's blatant and continuing violations of the Titan SIA require the Court to consider fundamental questions regarding the propriety and efficacy of the present chapter 11 case. These include the following:

(A) whether the Property is property of the Debtor's estate within the meaning of section 541 of the Bankruptcy Code, or whether the Property is held outside of the Debtor's estate by virtue of section 541(b)(1) of the Bankruptcy Code or a similar provision because the Property is held for the benefit of Builders Capital (pursuant to paragraphs 2, 13, and 14 of the Titan SIA);[9]

---

[9] Section 541(b)(1) of the Bankruptcy Code provides that "[p]roperty of the estate does not include . . . any power that the debtor may exercise solely for the benefit of an entity other than the debtor." 11 U.S.C. § 541(b)(1). Property held in trust by a debtor is not part of the bankruptcy estate. *See United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 (1983) ("We note only that Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition."); *In re LAN Tamers, Inc.*, 329 F.3d 204, 210 (1st Cir. 2003) (quoting S.Rep. No. 95–989 (1978), at 82)(property is excluded from the estate where the "property ostensibly belonging to the debtor will actually not be property of the debtor, but will be held in trust for another."); *see also Keach v. Wheeling & Lake Erie*

14

(B)     whether, absent Builders Capital's consent, Titan and the Debtor are authorized to take any action or file any motion with respect to the chapter 11 case including, without limitation, any action to borrow money, encumber the Property (if it is estate property), or seek the retention of bankruptcy counsel (pursuant to paragraphs 6.1, 9, 12, 14, and 16 of the Titan SIA);

(C)     whether actions already taken by Titan to abscond the Property to the Debtor and authorize the commencement of this case, which were taken without the authority of Builders Capital, are void or voidable (pursuant to paragraphs 6.1, 9, and 12 of the Titan SIA); and

(D)     whether there is any utility whatsoever to the chapter 11 proceeding given Builders Capital has paid all mechanic's liens and any is entitled to be paid in full before Titan receives any payment whatsoever (pursuant to paragraph 2, 13, and 14 of the Titan SIA).[10]

28.     It is against this backdrop that Titan and the Debtor's decision to commence this chapter 11 case and propose the present DIP Financing must be reviewed under the heightened scrutiny required by the First Circuit.  In light of all of the foregoing, it strains credulity to even entertain notions that the proposed DIP Financing—or the chapter 11 case in total—represent a reasonable and sound exercise of the Debtor's business judgment (because the Debtor has no business judgment other than Titan's judgment), that the Debtor could ever be trusted to act in a way that is entirely fair to Builders Capital and respects the fiduciary duties that the Debtor owes to Builders Capital and the estate, or that Titan and the Debtor will not continue to take advantage of their control over the Property and the chapter 11 process to enhance Titan's position vis-à-vis Builders Capital and in contravention of the Titan SIA.

29.     The Debtor's rejoinder likely includes that each of Titan and the Debtor are represented by competent and experienced chapter 11 counsel who independently advised each of Titan

---

*Ry. Co.* (*In re Montreal, Maine & Atl. Ry., Ltd.*), 888 F.3d 1, 11 (1st Cir. 2018) (property held in escrow, or an arrangement akin to a bailment, is not property of the debtor's estate, which "prevent[s] creditors from sharing in funds that the debtor could not have retained for its own use.").

[10]     This final point is particularly salient given that there are continuing defaults to Builders Capital that have not been cured by Titan.  Pursuant to paragraph 2 of the Titan SIA, Titan agreed to subordinate its right to payment in the event of a default.  Further, pursuant to paragraph 7.1–7.3, Titan was and is afforded the opportunity to cure any default by Cumberland.  Rather than opting to take this path Titan instead pursued the present course.

and the Debtor, respectively, and therefore any issues arising out of the insider-nature of the DIP financing are inconsequential. Builders Capital, regrettably, does not and cannot concede to such contention. For starters, independent and competent counsel cannot paper over the inherent issue that Titan and Edward Piazza are on both sides of every transaction in this matter and are fully in control of the Debtor. There is nothing stopping Mr. Piazza from directing Debtor's counsel to act in a way not in the best interest of Builders Capital, or to fire Debtor's counsel and replace them with more compliant counsel if they decline to.

30.      What is more, the Debtor introduced its own host of knotty questions by virtue of the pending application to retain chapter 11 counsel. As discussed in greater detail in the *Objection to Application of the Debtor for Order Pursuant to §§ 327 and 328 of the Bankruptcy Code Authorizing Employment of Bernstein, Shur, Sawyer & Nelson, P.A. as Counsel to the Debtor, Effective as of the Petition Date* filed together with this Objection, and as disclosed by the Debtor's counsel in its retention application and declaration in support thereof [Dkt. Nos. 49 & 49-1], there is a fundamental question as to whose interests the Debtor's counsel was representing when it formed the Debtor for the purpose of taking transfer of the Property and commencing this proceeding. The Debtor's counsel discloses that its representation of the Debtor began on March 14, 2025, which is five days before the Debtor came into existence as a legal entity per Maine law and the Debtor's Certificate of Formation. 31 M.R.S.A. § 1531(2). Like most states that adopted a similar version of the Uniform Limited Liability Act, Maine law "requires an LLC to have at least one member and an LLC Agreement at the time of formation. The Drafting Committee decided that shelf LLCs [without members] were unnecessary in Maine and could result in unintended consequences if adopted." Kevan Lee Deckelmann et. al., *Maine's New Limited Liability Company Act, Article 1 in A Series of 3*, 25 Me. B.J. 181, 184 (2010).

16

31.     Therefore, it is unclear who, other than Titan, the Debtor's proposed counsel was actually representing when filing the Certificate of Formation, particularly given that Titan is (directly or indirectly) the sole-member of the Debtor.  At bottom, the circumstances surrounding legal representation of the Debtor shines a light on more issues than it resolves, and it cannot absolve Titan or the Debtor from Builders Capital's grave concerns regarding the Debtor's ability to act fairly and in Builders Capital's best interests.

**II.     The Debtor Has Failed To Demonstrate Any Basis For Priming Builders Capital.**

32.     In light of all of the foregoing, and mindful of the heightened scrutiny that the Court must apply to this Motion, Builders Capital further submits that the Debtor has failed to demonstrate a basis, pursuant to section 364(d) of the Bankruptcy Code, to prime Builders Capital's first priority liens.  Section 364(d)(1) requires that in order to "obtain[] . . . credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien" a debtor must demonstrate that "(A) the [debtor] is unable to obtain such credit otherwise; and (B) there is adequate protection of the interest of the holder of the lien on the property of the estate . . . ."  11 U.S.C. § 364.

33.     "The ability to prime an existing lien is extraordinary, and in addition to the requirement that the trustee be unable to otherwise obtain the credit, the trustee must provide adequate protection for the interest of the holder of the existing lien or obtain such lien holder's consent." *In re Grupo HIMA San Pablo, Inc.*, No. 23-02510 (ESL), 2023 WL 5498101, at *6 (Bankr. D.P.R. Aug. 24, 2023) (quoting 3 Collier on Bankruptcy, ¶364.05[1] (16th ed. 2023)); *In re YL W. 87th Holdings* I LLC, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("granting post-petition financing on a priming basis is extraordinary and is allowed only as a last resort."). "[I]n addition to the requirement that the trustee be unable to otherwise obtain the credit, the trustee must provide

17

adequate protection for the interest of the holder of the existing lien." *In re Seth Co., Inc.*, 281 B.R. 150, 153 (Bankr. D. Conn. 2002).

34.    Generally, "adequate protection is provided by conditioning or limiting the borrowing in order to maintain a sufficient equity in the subject property to protect the existing lienholder." *Id*. (quoting 3 Collier on Bankruptcy ¶ 364.05 (15th Ed. Revised 2002)).  "Whether protection is adequate depends directly on how effectively it compensates the secured creditor for loss of value caused by the superpriority given to the post-petition loan." *In re Swedeland Dev. Grp.*, Inc., 16 F.3d 552, 564 (3d Cir. 1994) (internal quotation marks omitted); *id.* ("the proposal should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing.").

35.    *First*, there is no evidence in the record whatsoever regarding the Debtor's efforts to seek alternative financing on more advantageous terms or from a lender other than Titan.  In fact, the Motion itself contains only the most threadbare statement that the Debtor "does not believe that it could identify" alternative sources to obtain financing from another lender.  [Dkt No. 8 ¶ 18].  This is woefully inadequate, particularly in the circumstances of this case.  Before the Court grants any final relief on the Motion, Builders Capital requires the opportunity to take discovery of, *inter alia*, the Debtor's pre-petition or post-petition efforts to obtain alternative financing on more favorable terms or from a lender other than Titan.  The Court cannot grant the relief requested by the Motion without a serious and fulsome inquiry into these topics.

36.    *Second*, under the Bankruptcy Code, the Debtor has the burden to prove that Builders Capital's interests are adequately protected despite the proposed priming DIP Loan. *See* 11 U.S.C. § 363(p)(1) ("the [debtor] has the burden of proof on the issue of adequate protection").  "A finding of adequate protection should be premised on facts, or on projections grounded on a

firm evidentiary basis." *In re Mosello*, 195 B.R. 277, 292 (Bankr. S.D.N.Y. 1996). Again, the Debtor has offered no evidence to support the notion that Builders Capital is adequately protected, and the evidence in the record reflecting valuation of the Property suggests the Debtor likely *cannot* adequately protect Builders Capital from diminution of its interest caused by a priming loan.

37.     To elaborate, Builders Capital holds a valid first priority lien on the Property. Despite the Debtor's scheduling of Builders Capital's claim as "disputed" in its Schedules (for reasons not known to Builders Capital), there does not, in fact, appear to be any serious dispute at this time regarding the amount, validity, priority, or extent of Builders Capital's interest, particularly given payment of the mechanic's liens by Builders Capital. *See*, *e.g.*, Exhibit 2 to the Motion (providing a schedule of liens and claims attached to the Property, and listing Builders Capital with a claim of $20,111,732.34 behind only the mechanic's liens). Given Builders Capital's position and the Debtor's valuation of the Property for $15,000,000.00, any priming lien will necessarily and immediately harm Builders Capital by placing it behind new, higher priority debt. The Debtor's Schedules reflect that Builders Capital's claim is already underwater, and the Debtor has no other collateral to offer Builders Capital or the DIP Lender to make up for this reality. Under these facts, there is no basis for the Court to find that Builders Capital is adequately protected. *See In re Mosello*, 195 B.R. at 292–93 (denying chapter 11 debtors' motion for priming financing where first lien lender's debt exceeded collateral value, and "the debtors' development scheme [was] beset by uncertainty and risk, and the ultimate outcome of the project [was] a matter of speculation based upon assumptions which cannot be quantified or verified by objective evidence.").

38.     Instead of offering anything certain, much less "the same level of protection it would have had if there had not been post-petition superpriority financing," *In re Swedeland Dev. Grp.*, Inc., 16 F.3d at 654, the Debtor's proposed adequate protection package is entirely

speculative, hopeful, and uncertain. Builders Capital certainly wants to share in the Debtor's wishful thinking that a relatively small amount of financing will result in a windfall of value to make Builders Capital and other parties whole. Nonetheless, hope is not a strategy, and even less so is it adequate protection of Builders Capital's interests. *See In re Pac. Lifestyle Homes, Inc.*, No. 08-45328, 2009 WL 688908, at *12 (Bankr. W.D. Wash. Mar. 16, 2009) (denying postpetition financing premised on an increase in value postpetition, wherein the debtor relied on "hopes and projection of future profitability," during a period of significant financial volatility). Builders Capital has not had the opportunity to see or investigate the Debtor's purported analysis allegedly supporting the notion that the DIP financing would result in a "substantial increase in value." *Motion* ¶ 25. The Debtor has offered no evidence to support the finding that Builders Capital is adequately protected because "the value of the real property . . . will increase in an amount that exceeds the amount of the DIP Obligations[.]" *Proposed Final Order* ¶ J.

39.     The cases relied on by the Debtor for the proposition that a post-petition increase in value is sufficient to prime a first lien security interest are easily distinguished, and in fact, they are useful for further clarifying the reasons why granting priming liens would be inappropriate in this case. In *In re Vander Vegt*, 499 B.R. 631, 639 (Bankr. N.D. Iowa 2013), the bankruptcy court approved of priming liens, despite the fact that the debtor lacked equity in the property to support those liens, because the U.S. Department of Agriculture had already approved the debtor for $300,000.00 in grant funding that would be used by the debtor to repay the financing immediately upon receipt. Therefore, the financing carried "significantly less risk" than in more traditional, "highly speculative" real estate development cases. *Id.*, 638–39. Likewise, in *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, the chapter 11 debtor, prior to requesting approval of financing including priming liens, had already identified prospective tenants prepared to enter into a multi-year lease

20

and the amount at which they were willing to rent the subject property.  Upon information and belief, the Debtor has no prospective buyers lined up to quickly begin monetizing the Property upon its completion and, particularly in light of increasing economic volatility and uncertainty, the Debtor's aspirations to rapidly begin selling condominium units at a price that will ensure that Builders Capital's interests remain intact is entirely speculative.[11]  Moreover, Builders Capital understands that the property does not even have approvals to sell units as individual condominiums even if such monetization prospects were otherwise available.

40.     The glaring omissions of evidence to support relief under section 364(d) of the Bankruptcy Code, which precludes the Debtor from priming Builders Capital's interests, are far from the Debtor's only oversights.  The Debtor also requests authority to enter into and execute "commercially reasonable loan documents with the DIP Lender." *Proposed Final Order* ¶ 5. These documents, which have not been filed and which Builders Capital has not had the opportunity to review, must be filed and all terms clearly disclosed.  The Debtor requests approval of a rate of interest of 12.0% on borrowings under the DIP Facility, yet provides no support for the proposition that this rate is reasonable for an insider DIP loan or the most favorable rate available to the Debtor.[12]  The Debtor also requests approval of the Proposed Final Budget containing various line item expenditures that have not been sufficiently explained or justified, such as: (A) $50,000.00 for marketing and rebranding, (B) $14,000.00 for property management while

---

[11]     It is also worth noting recent news reports suggesting a downward correcting in pricing in the local housing market.  Peter Van Allen, Maine Home Sales in April were flat, though median price edged upward, MaineBiz, available at https://www.pressherald.com/2025/05/22/maine-home-sales-fell-and-prices-rose-in-april-as-market-heats-up-for-summer/ (last checked May 23, 2025).  Per a report quoted in the article: "Inventory is up, prices are down, but demand is holding steady. That's a textbook correction."

[12]     The Debtor's justification for a 12% rate of interest seems to be merely that it is "significantly less than the Builders' Capital interest rate." *Motion* ¶ 21.  However, Cumberland (not the Debtor) – in an arm's-length, non-insider financing with Builders Capital – agreed to pay a variable rate of interest of not less than 11.24% and pegged to the prevailing 1-Month Term Secured Overnight Financing Rate plus an agreed upon margin.  18.0% per annum is the default rate of interest that Cumberland, not the Debtor, agreed to pay to Builders' Capital.

construction is ongoing, (C) $8,000.00 for landscaping, (D) $20,000.00 for a "miscellaneous" reserve, and (E) $125,000.00 for legal fees to Debtor's counsel.  The Debtor must be required to provide a detailed plan for each of these expenses before the Court approves them.  Given the insider nature of the proposed financing and the concerning circumstances leading to the Debtor's creation and commencement of this case, *all* of these terms should be carefully scrutinized by the Court and parties in interest before any additional borrowing is approved on a final basis.

### III.   <u>Titan Has Not Acted In Good Faith And Is Not Entitled To Good Faith Protections</u>.

41.   Finally, the Debtor also requests that the Court make a finding that the DIP Facility was negotiated in good faith between the Debtor and Titan, and therefore order that Titan is entitled to the protections of section 364(e) of the Bankruptcy Code.

42.   Section 364(e) provides that the "reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith."  11 U.S.C. § 364(e).  "To determine good faith we look to the integrity of an actor's conduct during the proceedings.  Misconduct defeating good faith includes fraud, collusion, or an attempt to take grossly unfair advantage of others.  A creditor fails to act in good faith if it acts for an improper purpose.  Knowledge of the illegality of a transaction also defeats good faith."  *Keltic Fin. Partners, LP v. Foreside Mgmt. Co.* (*In re Foreside Mgmt. Co., LLC*), 402 B.R. 446, 452 (B.A.P. 1st Cir. 2009) (quoting *In re Adams Apple, Inc.*, 829 F.2d 1484, 1489 (9th Cir. 1987)).  "Parties lack the requisite good faith when they fail to reveal ulterior motives that may affect the court's reasoning.  Parties similarly lack good faith when they fail to reveal material facts."  *In re White Crane Trading Co., Inc.*, 170 B.R. 694, 705 (Bankr. E.D. Cal. 1994).

43.     Based on all of the foregoing, Builders Capital submits that Titan has not extended credit to the Debtor in good faith.  In fact, Titan and the Debtor—under Titan's control—have acted collusively and in a manner engineered to benefit Titan at Builders Capital's expense.  Titan has knowingly and flagrantly violated the Titan SIA, and continues to violate the Titan SIA through its actions in this case.  Further, Titan and the Debtor failed to share material facts regarding the transfer of the Property to the Debtor with Builders Capital and have failed to provide full and forthright disclosures regarding the Debtor's formation at the direction of Titan.  The culmination of these facts lead to the conclusion that Titan has acted in bad faith, and should not be entitled to any safe harbor protection pursuant to section 364(e) of the Bankruptcy Code.

**RESERVATION OF RIGHTS**

44.     Builders Capital expressly reserves all objections, argument, or rights of any nature with respect to the Motion, to be raised at or prior to a final evidentiary hearing.  Builders Capital further reserves all of its rights to seek dismissal of this bankruptcy case as a bad faith filing, relief from the automatic stay, conversion to Chapter 7, appointment of a Chapter 11 trustee, and any other relief that Builders Capital deems necessary and proper.

**CONCLUSION**

Based on the foregoing, Builders Capital respectfully requests that the Court enter an order (i) denying the Motion; and (ii) granting such other and further relief as the Court deems just and proper.

Dated:  May 23, 2025

Respectfully submitted,

*/s Andrew C. Helman*
Andrew C. Helman
Kyle D. Smith
DENTONS BINGHAM GREENEBAUM LLP
One City Center; Suite 11100
Portland, ME, 04101
Phone: (207) 619-0919
Email:  andrew.helman@dentons.com
         kyle.d.smith@dentons.com

-and-

Michael Schuster
POLSINELLI PC
1401 Lawrence Street, Suite 2300
Denver, CO 80202
Phone: (720) 931-1188
Email: mschuster@polsinelli.com

-and-

Carter Wallace
POLSINELLI PC
600 Third Avenue, 42nd Floor
New York, NY 10016
Phone: (212) 803 - 9914
Email: cwallace@polsinelli.com

*Counsel for Builders Capital Finance, LLC*

## CERTIFICATE OF SERVICE

I, Andrew C. Helman, an individual eighteen years of age or older, hereby certify that on the date set forth below, I caused the foregoing document to be served on all parties receiving notice and service in this case through the Court's CM/ECF electronic filing service, which served the same on the parties receiving notice via the CM/ECF system.

Date: May 23, 2025

/s/ *Andrew C. Helman*
Andrew C. Helman
Dentons Bingham Greenebaum LLP
One City Center, Suite 11100
Portland, ME  04101
Phone: (207) 619-0919
Email: andrew.helman@dentons.com