**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| In re:<br><br>The Mark Real Estate Holdings, LLC<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 25-20100 |

**BUILDERS CAPITAL FINANCE LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE PURSUANT TO SECTION 1104 OF THE BANKRUPTCY CODE**

**REQUEST FOR EMERGENCY DETERMINATION**

**This Motion includes a request for an emergency determination pursuant to Local Rule 9013-4. A statement of the facts and circumstances justifying emergency determination, as required by Local Rule 9013-4(4), is included. Pursuant to Local Rule 9013-4(b), a notice of hearing advising interested parties of the date and time of the hearing and any objection deadline is forthcoming upon further guidance from the Court.**

BUILDERS CAPITAL FINANCE LLC ("**Builders Capital**"), by and through undersigned counsel, files this motion (the "**Motion**") requesting entry of an order appointing a disinterested individual to serve as a chapter 11 trustee of The Mark Real Estate Holdings, LLC (the "**Debtor**"), pursuant to section 1104 of title 11 of the United States Code (the "**Bankruptcy Code**"). In support of the Motion, Builders Capital respectfully states as follows:

**PRELIMINARY STATEMENT**[2]

The Debtor is nothing more than a strawman entity created by Titan to hinder and delay Builders Capital's enforcement of its remedies under its senior loan documents and to improve Titan's position and recovery vis-à-vis Builders Capital. Given Titan's past and continuing conduct with respect to Builders Capital's senior interests, Titan simply cannot be trusted to direct the

---

[1] The Mark Real Estate Holdings, LLC's principal place of business is 100 US Route 1, Cumberland, Maine 04021, and the last four digits of its taxpayer identification number are 8757.

[2] All capitalized terms used in this preliminary statement will have the meanings ascribed to such terms in the remainder of this Motion.

1

Debtor to execute its fiduciary duties as a debtor in possession. The services of a neutral and impartial chapter 11 trustee are vitally necessary if this case is to remain in chapter 11 and result in a successful and value-maximizing resolution.

Moreover, and unsurprisingly, Titan and the Debtor have already fallen down in their management of the affairs of the Debtor during this case. Indeed, at the Debtor's section 341 meeting held on May 27, 2025,[3] Edward Piazza, as the Debtor's representative, testified, among other things: (i) that there have been utility service interruptions at the Property; (ii) that he does not know the name of the Debtor's property management company or the extent to which the Property is or is not being secured; (iii) both that there is no working fire suppression system and that he is unaware if there is one; (iv) that he is familiar with the Titan SIA (having signed it as president of Titan) and understands that Builders Capital has a first priority mortgage, which must be paid prior to Titan; and, yet, (v) that he authorized the creation of the Debtor entity. Just as troubling is that his testimony frequently blurred the lines between his roles as the Debtor's representative and the president of Titan.

Continued management of the estate by the Debtor as a debtor in possession jeopardizes protection of the Property, which is Builders Capital's collateral; will serve only to provide Titan with untoward control over the chapter 11 process; and will result in increased litigation and legal fees. The only path forward to prevent further mismanagement and to ensure that the case is conducted fairly to all parties is the appointment of a chapter 11 trustee.

## BACKGROUND

1.    Since August of 2023, Builders Capital has been the senior secured lender financing the construction of a 45-unit condominium project in Cumberland, Maine (the "**Property**"). At

---

[3]    A transcript of the section 341 meeting is not yet available, and Builders Capital's description of Edward Piazza's testimony at the section 341 meeting is based on the best of Builders Capital's recollections and beliefs.

all times prior to April 3, 2025, the owner of the underlying property was Cumberland Foreside Partners, LLC ("**Cumberland**").

I.     **Builders Capital's Loan to Cumberland**

2.     On August 30, 2023, Construction Loan Services II, LLC, as lender, and Cumberland, as borrower, executed a Loan Agreement (the "**Loan Agreement**").

3.     In connection with the Loan Agreement, Cumberland, as maker, executed and delivered a Promissory Note to Construction Loan Services II, LLC dated August 30, 2023 (the "**Note**").

4.     The original maximum aggregate principal amount of the Note is $17,884,362.12.

5.     The Note is secured by, among other things, a Mortgage, Security Agreement, Assignment of Leases and Rents, Assignment of Contracts and Plans, and Fixture Filing, dated as August 30, 2023, and recorded on September 19, 2023, with the Cumberland County Register of Deeds on September 19, 2023, as Document No. 33423, at Book 40369, Page 250 (the "**Mortgage**")

6.     The Mortgage encumbers real property, improvements thereon and personal property at the Property, which is located at street address of 100 U.S. Route 1 a/k/a 102 U.S. Route 1 a/k/a 98-102 U.S. Route 1, Cumberland, Maine (and as more particularly described in the Mortgage).

7.     On December 11, 2023, Construction Loan Services II, LLC executed an Assignment of Mortgage and Loan Documents, assigning all of its interests in the Loan Agreement, Note, Mortgage, and the Property, to Builders Capital.

24797033.v6

## II. The Subordination and Intercreditor Agreement

8. Contemporaneous with the Loan Agreement, Cumberland also entered into a junior priority secured loan (the "**Titan Loan**") with Titan Funding LLC ("**Titan**"), secured by a second lien on the Property, in the original aggregate maximum principal amount of $5,700,000.00.

9. On August 30, 2023, to memorialize the junior priority of the Titan Loan relative to Builders Capital, Titan executed a Subordination and Intercreditor Agreement (the "**Titan SIA**") dated August 30, 2023, which was recorded on September 19, 2023 in Cumberland County, Maine. A copy of the Titan SIA is attached hereto as **Exhibit A**.

## III. The Loan Default

10. Cumberland defaulted under the Loan Documents for the following: (i) failure to make the monthly payments of debt service and other amounts; (ii) failure to obtain Builders Capital's approval prior to making changes to the development plan for the Property; (iii) failure to provide financial information required under the Loan Agreement; (iv) failure to insure, maintain, and secure the Property; and (v) failure to pay the entire outstanding balance under the Loan Agreement and Note at maturity.

11. Builders Capital provided Cumberland with notices of default on November 1, 2024 (the "**November Default Notice**"), and January 14, 2025 (the "**January Maturity Default Notice**"). Each default notice was provided to Titan. Pursuant to the Titan SIA, Titan agreed that until such time that Builders Capital is paid in full, Cumberland shall not make any payment to Titan.

12. As of May 8, 2025, the outstanding balance on the Loan Agreement is no less than $23,420,348.86 and is accruing additional interest at a per diem rate of $11,663.97.

**IV.** **The State Court Action and Receiver Motion**

13. Pursuant to the Titan SIA, Titan was and is contractually barred from opposing a request for a receiver made by Builders Capital.

14. On March 5, 2025, Builders Capital commenced an action for damages against Cumberland and sought, among other things, the appointment of a receiver, in the Superior Court of the State of Maine, Cumberland (the "**State Court**" and "**State Court Action**").

15. On or about March 7, 2025, Builders Capital filed an emergency motion to appoint receiver in the state court action (the "**Receiver Motion**").

16. The State Court held a hearing on the Receiver Motion and subsequently entered a Conference Record and Order dated April 15, 2025 stating "**The court will grant the Motion for Receiver**" (emphasis added) and directing the parties to attempt to resolve their remaining dispute on the form of order, or else file competing forms of order for the State Court's consideration.

**V.** **Titan's Efforts to Take Control of the Property**

17. Beginning on March 19, 2025, if not earlier, while the State Court Action and the Receiver Motion remained pending, Titan began, unbeknownst to Builders Capital, to pursue a separate course of action to hinder and delay the appointment of a receiver and to remove the Property to a newly formed strawman entity, the Debtor.

18. The Debtor, The Mark Real Estate Holdings, LLC, was formed as a Maine LLC on March 19, 2025. Titan did not inform Builders Capital of the Debtor's formation. A copy of the Limited Liability Company Agreement of the Debtor is attached hereto as **Exhibit B** (the "**Operating Agreement**").

24797033.v6

19. On April 3, 2025, unbeknownst to Builders Capital, the Debtor entered into an Asset Purchase Agreement, attached hereto as **Exhibit C** (the "**APA**") with Cumberland, to purportedly transfer the Property from Cumberland to the Debtor.

20. The recitals to the APA indicate that Titan engineered the purported transfer of the Property for its own benefit and in response to the initiation of legal proceedings to foreclose on the Property, by virtue of which Titan perceived a risk that it would not be repaid. Therefore, per the APA's recitals, Titan created the Debtor and proposed the transfer of the Property to the Debtor to "protect [Titan's] interests" and to "directly benefit[] [Titan]."

21. The APA provides, among other things, that the consideration for the transfer was: (i) the assumption of liabilities by the Debtor, (ii) an agreement for back-end sharing of proceeds between Titan and Mark McClure, and (iii) a grant of releases to Mark McClure. It is unclear whether the releases in section 3.1 of the APA purport to release claims that Cumberland may have had against Mark McClure contemporaneous with a transfer of those claims to the Debtor or whether such releases could even be effective in light of the restrictions on Titan per the Titan SIA.

22. Pursuant to paragraph 5.4 of the APA, the Debtor has the option to cancel and unwind the purported transfer of the Property within 90 days of the closing under the APA. Notably, however, exercise of the unwind provision by the Debtor does not impact effectiveness of the releases granted in section 3.1.

### VI. Post-Petition Events

23. Titan and the Debtor are continuing to violate Builders Capital's rights as a first priority secured lender and under the Titan SIA.

24. These actions include, without limitation, (i) causing the Debtor to file a motion for post-petition financing which would grant Titan a senior lien on the Property; (ii) proposing to

6

retain Bernstein, Shur, Sawyer & Nelson, P.A. as counsel for the Debtor despite questions about who that firm represented in connection with the formation of the Debtor; and (iii) representing to third parties that the Debtor is the rightful and beneficial owner of the Property.

25. To make matters worse, Titan is failing to competently operate the Debtor in bankruptcy. Examples of the Debtor's post-petition mismanagement include: (i) allowing utility service to the Property to be shut off for non-payment even after obtaining post-petition financing to pay for these exact expenses;[4] (ii) upon information and belief, failing to properly insure the Property; (iii) upon information and belief, failing to properly supervise and secure the Property; and (iv) refusing to provide Builders Capital with information concerning the maintenance, preservation, and security of the Property.

26. The Debtor's failure to properly manage and protect the Property has consequences. On May 21, 2025, Builders Capital was informed by its insurance broker that the Property's current condition made it difficult to obtain force-placed insurance to protect Builders Capitals' interests. Builders Capital does not know if the Debtor has its now insurance adequate to protect Builder's Capitals interests, or whether Builders Capital is a loss payee under any insurance coverage the Debtor has. Further, Builders Capital does not know if the lack of a functioning fire protection system or utility interruptions may provide cause for an insurer to deny coverage in the event of a catastrophic loss at the Property.

27. On May 27, 2025, the U.S. Trustee convened a meeting of creditors pursuant to section 341 of the Bankruptcy Code. Edward Piazza appeared and testified as a representative of the Debtor. Builders Capital's undersigned counsel also appeared at the section 341 meeting and questioned Mr. Piazza regarding a variety of topics. Although a transcript of the section 341

---

[4] On May 14, 2025, Builders Capital learned that water service had been shut off due to non-payment, and on May 20, 2025, Builders Capital learned that electrical power had been shut off for the same reason.

7

meeting is not yet available and Mr. Piazza's testimony was at times unclear, Mr. Piazza's testimony was gravely concerning to Builders Capital. Specifically, Builders Capital understands that Mr. Piazza testified that, among other things:

(i) there have in fact been utility service interruptions at the Property during the chapter 11 case, though he testified electricity was only shut off with respect to portions of the Property due to separate metering;

(ii) he did not know the name of the property management company that the Debtor has tasked with the responsibility of providing on-site security and supervision at the Property and was unable to say whether the Property was being secured;

(iii) both that there is no working fire suppression system and that he is unaware if there is one;

(iv) Builders Capital possesses a valid, secured, first lien interest in the Property, with a priority above any interest possessed by Titan;

(v) based on the Titan SIA (a document that Mr. Piazza signed on behalf of Titan and testified that he is familiar with), Builders Capital must be paid in full before Titan may receive any payment on its junior debt;

(vi) the Debtor did not seek to obtain any consent from Builders Capital prior to commencing the chapter 11 case or with respect to any motion or applications filed in the chapter 11 case;

(vii) he was not familiar with of the extent of releases granted by the Debtor to Mark McClure under the APA and as part of Titan and the Debtor's deal to acquire and control the Property, including whether the Debtor agreed to release potentially valuable causes of action that Cumberland may have possessed against Mark McClure and which may have been transferred to the Debtor; and, finally,

(viii) he personally authorized the formation of the Debtor.

Furthermore, Edward Piazza, throughout his testimony at the section 341 meeting frequently referred to the Debtor and Titan nearly interchangeably, using terms "we" and "our" to refer to both entities, suggesting an identity of interests that is of concern to Builders Capital.

Case 25-20100 Doc 85 Filed 05/27/25 Entered 05/27/25 21:40:00 Desc Main
Document Page 9 of 20

**RELIEF REQUESTED**

28. Based on the foregoing, Builders Capital respectfully requests that the Court remove the Debtor from possession and appoint a chapter 11 trustee pursuant to section 1104(a) of the Bankruptcy Code.

**BASIS FOR RELIEF**

**I.  General Standards for Appointment of a Chapter 11 Trustee**

29. A debtor-in-possession owes fiduciary duties to its creditors and the bankruptcy estate. *In re Morningstar Marketplace, Ltd.*, 544 B.R. 297, 303 (Bankr. M.D. Pa. 2016) (citing *In re Marvel Entm't. Corp.*, 140 F.3d 463, 471 (3d Cir. 1998)); *see also In re Thomas*, 596 B.R. 350, 360 (Bankr. W.D. Tenn. 2019) ("The debtor-in-possession is a fiduciary of the creditors and, as a result, has an obligation to refrain from acting in a manner which could damage the estate, or hinder a successful reorganization.") (internal quotations and citation omitted). As a fiduciary, the debtor-in-possession's obligations "include a duty of care to protect the [estate's] assets, a duty of loyalty and a duty of impartiality." *In re Eurospark Indus., Inc.*, 424 B.R. 621, 627 (Bankr. E.D.N.Y. 2010).

30. The rights of a debtor-in-possession, however, are not absolute and must be forfeited if these fiduciary duties are neglected. *See id.* (collecting cases). Although courts will presume "that the debtor-in-possession should be permitted to remain in control of the corporation absent a showing of need for the appointment of a trustee," *see In re Thomas*, 596 B.R. at 359 (quoting *In re Nartron Corp.*, 330 B.R. 573, 591 (Bankr. W.D. Mich. 2005)), "[t]his presumption is based on the fact[] that the debtor in possession has a strong sense of familiarity with the business" and is able to perform its fiduciary duties. *See id*. at 359–60 (internal quotations and citation omitted).

9

24797033.v6

31. Section 1104 of the Bankruptcy Code empowers a party in interest to seek the appointment of a chapter 11 trustee for "cause" *or* because such appointment would serve the "interests of the estate," including its creditors. *See* 11 U.S.C. § 1104(a). The statute provides as follows:

> [a]t any time after the commencement of the case but before confirmation of a plan, on request of a party in interest . . . and after notice and a hearing, the court shall order the appointment of a trustee –
>
> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
>
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

*Id*.

"[T]he question of whether a trustee should be appointed in a Chapter 11 case must be considered by the court on a case-by-case basis considering a totality of the particular facts and circumstances …." *In re Thomas*, 596 B.R. at 360. Courts are afforded discretion to determine whether grounds exist for the appointment of a chapter 11 trustee; however, if the court determines that such grounds exist, the court "shall order the appointment of a trustee." *See* 11 U.S.C. § 1104(a); *see also In re Thomas*, 596 B.R. at 360, 363. Such a determination should be made based on a preponderance of evidence. *Tradex v. Morse*, 339 B.R. 823, 826 (D. Mass. 2006).

**II. Appointing a Trustee for "Cause" Pursuant to Section 1104(a)(1)**

32. Section 1104(a)(1) provides a list of examples that constitute "cause" for the appointment of a trustee, including "dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case …." *See* 11 U.S.C. § 1104(a)(1). However, according to the First Circuit:

10

> The inquiry into whether cause exists for the appointment of a chapter 11 trustee is not limited to the enumerated list but extends to "similar cause." *See* 11 U.S.C. § 1104(a)(1). In determining whether a particular set of circumstances establishes cause under this prong of § 1104(a), courts have considered a variety of factors, including: (1) Materiality of the misconduct; (2) Evenhandedness or lack of such in dealings with insiders or affiliated entities vis-a-vis other creditors or customers; (3) The existence of pre-petition voidable preferences or fraudulent transfers; (4) Unwillingness or inability of management to pursue estate causes of action; (5) Conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties owed to the debtor; [and] (6) Self-dealings by management or waste or squandering of corporate assets . . . While any one factor may not warrant appointment of a trustee, the court must consider the cumulative or collective impact of the alleged problems or issues in making its decision . . . That is, the court must determine whether the totality of the circumstances warrant appointment of a trustee . . .

*United Surety & Indemnity Co. v. Lopez-Munoz* (*In re Lopez-Munoz*), 553 B.R. 179, 190 (B.A.P. 1st Cir. 2016) (denying request for the appointment of a chapter 11 trustee under 11 U.S.C. § 1104(a)(1)), *affirmed, United Surety & Indemnity Co. v. Lopez-Munoz* (*In re Lopez-Munoz*), 866 F.3d 487 (1st Cir. 2017) (citations and internal punctuation omitted). See also *In re Thomas*, 596 B.R. at 360–61 (quoting *In re LHC, LLC*, 497 B.R. 281, 292 (Bankr. N.D. Ill. 2013*)); see also In re Nartron Corp.*, 330 B.R. at 592 (identifying factors).

33.     Often, the thread underlying each of the "cause" factors is the presence of "irreconcilable conflicts and acrimony between the debtor and creditors" such that "the appointment of a trustee to act as a neutral and efficient fiduciary [is] appropriate …." *In re Thomas*, 596 B.R. at 361 (citing *Marvel Entm't*, 140 F.3d at 472-74). Specifically, when "there is no reasonable likelihood of any cooperation among the [debtor and the estate's constituents] in the foreseeable future, and the parties have been working at cross-purposes," the risk of a "messy bankruptcy that promises to get worse [warrants] a disinterested administrator at the helm." *See id*. at 361, 362 (internal quotations and citations omitted). Otherwise, the function and purpose of a chapter 11 case will be undermined. *See id*. at 362 ("These rules shall be construed, *administered, and employed by the*

11

*court and the parties* to secure the just, speedy, and inexpensive determination of every case and proceeding.") (quoting Fed. R. Bankr. P. 1001) (emphasis in original).

34. All of the circumstances considered by courts in examining cause pursuant to section 1104(a)(1) are present in this case and justify the appointment of a chapter 11 trustee to administer this case. *See Lopez-Munoz*, 553 B.R. at 190 (listing factors). These factors include the following:

### Titan And The Debtor Have Engaged In Significant Misconduct

35. Titan, and by extension the Debtor, have engaged in significant misconduct, both before and after the commencement of this chapter 11 case. This misconduct undermines the Debtor's ability to serve as a fiduciary representative for the estate and appropriately exercise the duties owed to creditors, including Builders Capital. As Builders Capital has detailed, prior to commencing this case Titan took significant actions—in secrecy and while Titan knew that Builders Capital was pursuing alternative remedies—to form the Debtor, transfer the Property away from Builders Capital's selected borrower, Cumberland, and commence this chapter 11 case. These actions were taken to forestall Builders Capital's imminent appointment of a receiver in the State Court Action and are serious and damaging breaches of the Titan SIA.

36. What is more, this misconduct has continued after the Petition Date, and include the Debtor's efforts to prime Builders Capital valid first priority liens with no credible basis to do so, and Titan's continued exercise of control over the Debtor and this chapter 11 case in clear violation of the Titan SIA. Further, Titan has mismanaged the Debtor and put the Property in jeopardy during this case, even despite the Court granting the Debtor's emergency, interim funding request at the outset of this case to provide the Debtor the liquidity necessary to provide basic utilities and secured the Property.

12

24797033.v6

### Titan's Control Over The Debtor Prevents The Debtor From Acting Evenhandedly Towards Builders Capital

37. As Builders Capital has reiterated, the circumstances that led to this chapter 11 case have given rise to a current state of affairs that is untenable. Fundamentally, given Titan's secret pre-petition conduct and serious and continuing violations of the Titan SIA, Builders Capital simply cannot trust that a debtor under Titan's control will pay respect to the duties owed to the estate over and above Titan's individual interests. There is clear incentive in this case for Titan to use its control over the Debtor to improve its position and recovery at Builders Capital's expense and in clear and continuing violation of the Titan SIA. Indeed, the recitals in the APA, agreed to between Titan, the Debtor, and Cumberland, confirm that Titan engineered the present chapter 11 case in its own self-interest and without consideration or consultation of Builders Capital, which was simultaneously exercising its senior rights in the State Court Action. Titan and the Debtor's efforts, from the outset of this case, to seek an unnecessary priming lien that enhances Titan's position at Builders Capital's expense, further confirms that Builders Capital cannot trust either party (to the extent that there is any meaningful separation between them) to conduct this chapter 11 case in a manner designed to protect Builders Capital's interests or maximize Builders Capital's recovery.

### Transfer Of The Property To The Debtor Was Likely A Fraudulent Transfer

38. As Builders Capital has noted, Builders Capital believes that transfer of the Property from Cumberland to the Debtor was likely a fraudulent transfer intended to hinder and delay Builders Capital's legitimate, ongoing enforcement activities. Further, based the consideration described in the APA, it appears that the transfer of the Property left Cumberland, Builders Capital's chosen borrower, with little to no remaining value from which Builders Capital or other creditor could seek recovery. While Builders Capital's investigation of this transfer remains ongoing,

13

a chapter 11 trustee should be appointed in order to fully investigate this transfer and to pursue whatever remedies—in the trustee's judgement—may be in the best interest of creditors and the estate.

**A Chapter 11 Trustee Should Be Given The Opportunity To Investigate And Pursue Any Other Estate Causes Of Action**

39. Likewise, a chapter 11 trustee would be far better positioned to investigate and pursue any other estate causes of action. In the Debtor's Schedules of Assets and Liabilities (the "**Schedules**") and Statement of Financial Affairs (the "**Statements**") [Dkt. No. 57], the Debtor scheduled no valuable causes of action against third parties, and noted that "[t]he Debtor's investigation into causes of action is ongoing." Schedule A/B, Part 11, § 74. In his testimony at the Debtor's section 341 meeting, Edward Piazza appeared unable to identify any causes of action or parties that the Debtor is actually investigating or intends to investigate. Further, Edward Piazza's testimony reflected that he did not fully grasp the scope of releases purportedly provided to Mark McClure by the Debtor as part of the APA or even that the Debtor (as opposed to Titan) has provided any releases whatsoever.

40. Any investigation into causes of action that the estate may hold—including, potentially, causes of action against Titan (for, among other things, causing the Debtor to release potentially valuable causes of action), Cumberland, or other insiders—should be conducted by a neutral and impartial third party, rather than by the Debtor under the control of Titan.

**The Debtor's Management Is Rife With Conflicts Of Interest And Self-Dealing**

41. The Debtor's petition, resolutions authorizing a bankruptcy filing, and Schedules and Statements were signed by Edward Piazza as the manager of the Debtor. Moreover the Debtor's sole member, as reflected on the Operating Agreement, is Titan Funding Holdings 1, LLC ("**Titan Holdings**"), and Edward Piazza signed the Operating Agreement on behalf of both

14

the Debtor and Titan as the manager of Titan Holdings. Edward Piazza is also the president of Titan. Indeed, Edward Piazza signed the Titan SIA on behalf of Titan. Presumably, Edward Piazza likely had a hand in negotiating and influencing the Debtor's proposed DIP financing on behalf of both Titan, as proposed lender, and the Debtor, as proposed borrower. During his testimony at the Debtor's section 341 meeting, Edward Piazza was at times practically unable to distinguish between the Debtor and Titan and frequently used the terms "we" and "our" to refer to both parties. There is sparsely any issue in this case that Titan and Edward Piazza are *not* on both sides of, which is intolerable if this case is to go forward.

### III. Appointing a Trustee in the Interests of the Estate Pursuant to 11 U.S.C. § 1104(a)(2)

42. Section 1104(a)(2) provides an additional basis for the appointment of a chapter 11 trustee that is less stringent and more "flexible," and affords the Court more discretion. *See In re Thomas*, 596 B.R. at 362; *In re Wings Digital Corp.,* No. 05-12117, 2005 WL 3789334, at *5 (Bankr. S.D.N.Y. May 16, 2005). As an alternative ground for appointing a chapter 11 trustee, the court is not required to find "cause." *See Sharon Steel,* 871 F.2d at 1226; *see also Petit v. New England Mortg. Services Inc.*, 182 B.R. 64, 69 (D. Me. 1995) (noting that section 1104(a)(2) provides a flexible standard that entails "the exercise of a spectrum of discretionary powers and equitable considerations."). The flexible standard embodied by section 1104(a)(2) is "'intended to accommodate two goals: (1) facilitation of the debtor's reorganization; and (2) protection of the public interest and of creditors.'" *In re Thomas*, 596 B.R. at 362–63 (quoting 7 COLLIER ON BANKRUPTCY ¶ 1104.02[3][a]).

43. Section 1104(a)(2) affords courts "discretion to appoint a trustee when doing so would serve the parties' and the estates' interests." *In re Ashley River Consulting, LLC,* No. 14-13406, 2015 WL 1540941, at *11 (Bankr. S.D.N.Y. Mar. 31, 2015) (quoting *In re Marvel,* 140

15

F.3d at 474). This is a fact-driven analysis under the Court's broad equity powers. *See, e.g., In re Soundview Elite, Ltd.,* 503 B.R. 571, 582-83 (Bankr. S.D.N.Y. 2014). When evaluating appointment of a trustee under the "best interest" prong, the Court should "eschew rigid absolutes and look to the practical realities and necessities," *In re Hotel Associates, Inc.,* 3 Bankr. 343, 345 (Bankr. E.D. Pa. 1980), by considering the following four factors:

(a) the trustworthiness of the debtor;
(b) the debtor's past and present performance and prospect for rehabilitation;
(c) the lack of confidence among creditors in the debtor's management; and
(d) whether the benefits of a chapter 11 trustee outweigh the costs.

*In re Thomas*, 596 B.R. at 363; *In re Soundview Elite,* 503 B.R. at 583 (same); *In re Colorado-UTE Electric Ass'n*, 120 B.R. 164, 176 (Bankr. D. Colo. 1990) (same)

44. At bottom, section 1104(a)(2) embraces a remedy to ensure that the bankruptcy system functions properly and the rights of the estate's constituents are adequately balanced against the rights of the debtor; "that is, whether the benefits to all interests of the estate that would come from the appointment of a chapter 11 trustee outweigh the detriment of the estate." *In re Thomas*, 596 B.R. at 363.

45. Even if this Court determines that cause is lacking pursuant to section 1104(a)(1), the Court should, alternatively, appoint a chapter 11 trustee because such appointment is in the best interest of the estate and its creditors. In addition to the foregoing reasons, Builder's Capital submits that the following circumstances show that appointment of a trustee is in the best interest of the estate and its creditors:

### The Lack Of Trustworthiness Of The Debtor

46. For all of the foregoing reasons already stated, Builders Capital cannot trust the Debtor to fairly and administer its affairs in bankruptcy. Titan and the Debtor have already proven that they will use secrecy and deception to undermine Builders Capital's interests and violate its

16

rights. If this case remains in chapter 11 and Titan remains in control of the Debtor, then Builders Capital has no faith that Titan will not continue to undermine Builders Capital's interests for its own gain, including continuing to violate the Titan SIA despite the charge of section 510(a) of the Bankruptcy Code that subordination agreements must be respected and enforced in bankruptcy.

### The Debtor Has Little Prospect For Rehabilitation

47. The Debtor has zero track record of successfully managing the Property. Moreover, it is overwhelmingly likely that, even if the Debtor were able to stabilize and complete the Property, this case will move towards a sale of the Property. *See*, *e.g.*, DIP Motion ¶¶ 10 (discussing the Debtor's plans for "an orderly and strategic sale process."). In the event of a liquidation, no particular deference should be paid to the Debtor's management regarding the liquidation and Builders Capital's views—as the overwhelmingly largest creditor of the Property—should carry equal if not superior weight. *In re Commercial Mortgage and Finance Co.*, 414 B.R. 389, 394 (Bankr. N.D. Ill. 2009) (citing *In re S.N.A. Nut Co.*, 186 B.R. 98, 105 (Bankr. N.D. Ill. 1995). A sale process would be more successful under the supervision of a chapter 11 trustee and free from interference from the Debtor's management.

### The Benefits Of A Chapter 11 Trustee Outweigh The Costs

48. Builders Capital is continuing to evaluate a range of potential outcomes that would be suited bring a swift and effective resolution to this matter. While this evaluation remains ongoing, and would benefit from the input of an impartial chapter 11 trustee, Builders Capital does, at this time, view continuance in chapter 11 under the stewardship of a trustee as offering potentially value accretive features. This may include the ability of a chapter 11 trustee to oversee completion of Property. After completion, a chapter 11 trustee would have the ability to utilize the powers of section 363 of the Bankruptcy Code to conduct a cost-effective and value-maximizing

24797033.v6

sale of the Property during the chapter 11 case. The chapter 11 trustee would also be positioned to liquidate any other estate assets, including causes of action that the trustee is able to investigate and pursue on behalf of the estate.

49. It should go without saying that if the Debtor remains in possession then Builders Capital is unable to see a path forward for an efficient and effective resolution of this case. More likely, keeping the Debtor in possession of the estate will likely lead to lengthy and costly litigation and infighting between Titan, the Debtor, and Builders Capital. Such a path would assuredly increase costs and delay proceedings, and is not in the best interests of creditors or the estate.

### STATEMENT PURSUANT TO LOCAL RULE 9013-4(4)

50. Builders Capital files this Motion requesting relief on an emergency basis pursuant to Local Rule 9013-4(2)(A). Builders Capital submits that immediate action is necessary to remove the Debtor from possession and end Titan's control over the Debtor. Titan's continued control over this chapter 11 case is a continuing violation of the Titan SIA that must be addressed immediately. Moreover, Builder's Capital requests relief on an emergency basis due to the recent notices Builders Capital has received on May 14 and May 20 that utility services at the Property have been shut off, which has prevented Builders Capital from obtain insurance to cover the Property and puts Builders Capital's substantial investments in the Property at grave risk. Further, Edward Piazza's testimony at the section 341 meeting only further clarified to Builders Capital the importance and urgency of seeking the immediate appointment of a chapter 11 trustee. Builders Capital has faith that, in the event a chapter 11 trustee is appointed, that Builders Capital will be able to work with the chapter 11 trustee to ensure that services are quickly restored and stabilized and the Property is adequately protected going forward.

18

24797033.v6

**CONCLUSION**

Based on the foregoing, Builders Capital requests that the Court appoint a trustee under section 1104 of the Bankruptcy Code, and grant such further and additional relief as the Court deems proper.

Dated:  May 27, 2025                                        Respectfully submitted,

/s Andrew C. Helman
Andrew C. Helman
Kyle D. Smith
DENTONS BINGHAM GREENEBAUM LLP
One City Center; Suite 11100
Portland, ME, 04101
Phone: (207) 619-0919
Email: andrew.helman@dentons.com
       Kyle.d.smith@dentons.com

-and-

Michael Schuster
POLSINELLI PC
1401 Lawrence Street, Suite 2300
Denver, CO 80202
Phone: (720) 931-1188
Email: mschuster@polsinelli.com

-and-

Carter Wallace
POLSINELLI PC
600 Third Avenue, 42nd Floor
New York, NY 10016
Phone: (212) 803 - 9914
Email: cwallace@polsinelli.com

*Counsel for Builders Capital Finance, LLC*

24797033.v6

**CERTIFICATE OF SERVICE**

    I, Andrew C. Helman, an individual eighteen years of age or older, hereby certify that on the date set forth below, I caused the foregoing document to be served on all parties receiving notice and service in this case through the Court's CM/ECF electronic filing service, which served the same on the parties receiving notice via the CM/ECF system.

| | |
|---|---|
| Date: May 27, 2025 | /s/ *Andrew C. Helman* |
| | Andrew C. Helman |
| | Dentons Bingham Greenebaum LLP |
| | One City Center, Suite 11100 |
| | Portland, ME  04101 |
| | Phone: (207) 619-0919 |
| | Email: andrew.helman@dentons.com |

24797033.v6