## EXHIBIT A

## SETTLEMENT TERM SHEET

The Mark Real Estate Holdings, LLC
Case No. 25-20100
Settlement Term Sheet

In resolution of *Builders Capital Finance LLC's Motion to Appoint a Chapter 11 Trustee pursuant to Section 1104 of the Bankruptcy Code* (the "<u>Trustee Motion</u>") and other disputes, The Mark Real Estate Holdings, LLC (the "<u>Debtor</u>"), Builders Capital Finance, LLC and any applicable affiliate entities ("<u>BC</u>"), and Titan Funding, LLC and all applicable affiliate entities ("<u>Titan</u>" and, together with the Debtor and BC, the "<u>Parties</u>"), hereby agree to settlement on the following terms. Nothing in this term sheet shall be binding until agreed to by all parties in final form.

**<u>Construction Advisor Retention</u>**

1.   The Parties agree that, in lieu of appointment of a chapter 11 trustee or dismissal of the chapter 11 case, the Debtor shall retain Cordjia Capital Projects Group, to serve as a construction advisor (the "<u>Construction Advisor</u>") to the Debtor.  The Construction Advisor shall be delegated all powers to manage the completion and sale of the property located at 100 US Route 1, Cumberland, Maine 04021 (the "<u>Property</u>") in the chapter 11 case.

2.   Titan shall agree to fully and irrevocably relinquish all management powers and duties it has regarding the Property to the Construction Advisor, pursuant to the terms more fully described in (i) the draft resolution authorizing retention of the Construction Advisor, attached hereto as **<u>Exhibit A</u>**; and (ii) the draft Construction Advisor engagement letter, attached hereto as **<u>Exhibit B</u>**. Titan shall not provide direction to the Construction Advisor and the Construction Advisor shall not take direction from Titan with respect to any aspect of the chapter 11 case.  Further, the Debtor shall not terminate the services of the Construction Advisor without BC's prior written approval.  Termination of the Construction Advisor without BC's prior approval shall be considered an event of default entitling BC's to relief from the automatic stay in accordance with paragraph 11 of this term sheet.

3.   BC and Titan shall both be entitled to receive reporting from the Construction Advisor regarding the completion and sale of the Property, or other information as reasonably requested.

4.   BC shall fund a budget of up to $200,000.00 in the form of a protective advance by BC (the "Professional Budget") to be made at the earlier of: the close of a sale of the Property; or (ii) the allowance of applicable fees.  The Professional Budget shall be available to pay allowed fees of (1) counsel to the Debtor, (2) the Construction Advisor, and (3) counsel, if any, retained by the Construction Advisor.  The Professional Budget shall be allocated among eligible professionals, including but not limited to Keenan Auction Company, after consultation with the Construction Advisor, provided that not less than $65,000 of the Professional Budget shall be allocated exclusively for allowed fees of the Debtor's counsel (for the period starting upon retention of the Construction Advisor).  All payments to professionals shall be subject to court approval under the applicable provisions of the Bankruptcy Code.

24804845.v8

**Sale Process**

5.      BC shall provide up to $275,000.00 in funding, subject to terms provide below, to fund DeStefano & Associates, Inc.'s ("DeStefano") project costs per estimate dated June 10, 2025, a copy of which is attached as **Exhibit C**, subject to confirmation of the proposed costs with DeStefano, including costs necessary to obtain a certificate of occupancy. DeStefano has been the general contractor at the Property since the beginning of construction of the project, and the Debtor shall continue to employ DeStefano to complete construction at the Property and to obtain a certificate of occupancy.

6.      BC's funding of the Construction Advisor and the sale process, including carrying costs of the Property until closing of the sale, as set forth above, shall be deemed to be protective advances under BC's existing loan documents with Cumberland Foreside Partners LLC ("Cumberland"), which shall be assumed by the Debtor as set forth below. The Debtor shall be authorized to incur such additional credit to the extent necessary pursuant to section 364 of the Bankruptcy Code.

7.      BC shall have sole approval rights, and the Construction Advisor shall obtain BC's approval, over all further construction at the Property, subject to the terms of this Agreement. Such construction shall be performed materially in accordance with Exhibit C, or as modified as the Construction Advisor determines is reasonably necessary to complete construction of the Property in the manner contemplated by Exhibit C.

8.      The parties agree that the Construction Advisor shall conduct a sale process in accordance with the terms of this term sheet. The parties further agree that Keenan Auction Company shall be retained by the Debtor to conduct such marketing, sale, and auction process.

9.      The Parties agree to the following milestones (the "Milestones") for the construction, completion, and sale of the Property. BC shall have the right to extend any Milestone in its sole discretion by filing a notice with the Court if BC determines it to be necessary for Property to be completed and sold; *provided, however*, that the Milestone for sale of the Property shall not be extended to a date later than October 31, 2025:

   a.      Deadline for marketing of Property to commence: within 30 days of entry of court order approving this settlement term sheet
   b.      Deadline for filing application for certificate of occupancy of Property: within 5 business days after completion of construction of Property
   c.      Deadline for sale of Property: the later of September 15, 2025, or 30 days after issuance of a certificate of occupancy for the Property

10.     The Debtor shall provide a deed to the Property in lieu of foreclosure to BC (or an assignee to be designated by BC), subject to all existing liens and interests, to be held in escrow pending a default and stay relief as set forth in paragraph 11.

11.     Upon failure of the Debtor to satisfy a Milestone, BC shall be entitled to file a notice with the Court declaring that a default has occurred, and BC shall be granted relief from the automatic stay five business days after the filing of such notice to exercise rights and

24804845.v8

remedies against the Property and conduct a sale process for BC's benefit and for the benefit on any junior lienholders, unless otherwise ordered by the Court.

12.     A motion for sale of the Property and any sale, bid, and auction procedures proposed thereby must be consistent with this term sheet and acceptable to and approved by BC and in consultation with Titan. BC's approval under this provision shall not be unreasonably withheld.

**Other Matters**

13.     The Debtor shall assume all obligations under BC's loan documents with Cumberland Foreside Partners LLC; *provided however*, that the Debtor shall waive any and all defenses that Cumberland Foreside Partners LLC may assert under the BC loan documents. For the sake of clarity, BC shall not be deemed to release or waive claims or causes of action against Cumberland Foreside Partners, LLC, Mark McClure, or any other party by virtue of the Debtor's assumption of obligations under the BC loan documents.

14.     Titan shall agree that it is and continues to be bound by the terms of the Subordination and Intercreditor Agreement by and between BC and Titan (the "Intercreditor Agreement") and that it shall be a default hereunder if Titan breaches the Intercreditor Agreement during the remainder of the chapter 11 case. Nothing stated herein shall change, alter, modify or waive Titan's obligations to BC under the Intercreditor Agreement. Further, pursuant to the Intercreditor Agreement, Titan shall affirm its agreement to the following (which are not in any way intended to modify or supplant or limit the terms of the Intercreditor Agreement):

   a.     Titan agrees that its right to receive payment shall be subordinated to BC's right to receive payment. Until such time that BC is paid in full, Titan agrees that the Debtor shall not make any payment to Titan. Any payments received by Titan in contravention to the foregoing shall be held in trust for the benefit of and promptly turned over to BC.

   b.     Titan agrees that it shall not exercise any rights or remedies against the Property without the prior written consent of BC; *provided, however*, that, notwithstanding this provision, and to the extent permitted by section 363(k) of the Bankruptcy Code, Titan shall not be prohibited from credit bidding at any auction for the Property.

   c.     Titan agrees that it will not make any filing or election, give any consent, file any motion or objection, or take any other action in the chapter 11 case that is inconsistent with this agreement or otherwise prohibited by the Intercreditor Agreement.

15.     The Debtor, on behalf of itself and the estate, shall stipulate as to the amount, validity, and priority, of BC's claims. Further, Titan shall stipulate that BC holds a senior, first lien mortgage on the Property.

24804845.v8

16. All rights shall be reserved to BC to seek loan-related fees (including, but not limited to, attorneys' fees) and interest to the extent permitted under section 506(b).

17. The Debtor, on behalf of itself and the estate, shall waive any of surcharge rights against BC and the Property.

18. Titan shall not object to or otherwise oppose BC's right to credit bid the full amount of its indebtedness and shall not file a motion seeking to value BC's secured claim without BC's express consent, in BC's sole discretion.

19. Titan shall not object to the amount, validity, or priority of BC's claims in the Debtor's chapter 11 case, and shall not file a motion seeking a determination of value as to BC's claims in the Debtor's chapter 11 case; *provided, however*, that Titan's rights set forth in paragraph 20 shall remain reserved, and nothing herein shall constitute a waiver of Titan's rights or defenses.

20. All claims, defenses, and causes of action held by BC shall be preserved without waiver of any rights, remedies, or arguments, and, except as may otherwise be set forth herein, all claims, defenses, and causes of action held by Titan be shall preserved without waiver of any rights, remedies, or arguments.

21. Titan shall pay any and all legal fees incurred by Bernstein, Shur, Sawyer & Nelson, P.A. in connection with the chapter 11 case as of the retention of the Construction Advisor.

22. Provided that the parties are not in default of this term sheet, BC and Titan hereby agree to not engage in any litigation against the other until the conclusion of the sale of the Property, whether through complaints for damages or injunctive relief, and whether in an adversary proceeding related to the chapter 11 case or in another venue.

24804845.v8



## THE MARK REAL ESTATE HOLDINGS, LLC

## WRITTEN RESOLUTION OF SOLE MEMBER AND MANAGER
## WITHOUT A MEETING

The undersigned, being the sole member the ("Member") and the manager (the "Manager") of the Mark Real Estate Holdings, LLC (the "Company"), in accordance with the Limited Liability Company Agreement dated on or about March 19, 2025, and without a meeting based on the unanimous written consent of the Member and the Manager, hereby adopt and consent to the following actions and resolution of the Company:

**WHEREAS:** The Member and Manager have determined, in accordance with that certain Settlement Term Sheet (the "Term Sheet") by and between the Company, Builders Capital Finance, LLC and any applicable affiliate entities ("BC"), and Titan Funding, LLC and all applicable affiliate entities ("Titan" and, together with the Company and BC, the "Settlement Parties"), that it is in the best interest of the Company and the Settlement Parties to agree to a global resolution of issues in the Company's pending proceeding under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") at Case No. 25-20100 (the "Chapter 11 Case") before the United States Bankruptcy Court for the District of Maine (the "Court"); and further

**WHEREAS:** The Member and Manager have determined, in accordance with the Term Sheet, that retention of a construction advisor (the "Construction Advisor") to oversee the Company's management of the construction and sale of the property located at 100 US Route 1, Cumberland, Maine 04021 (the "Property") in the Company's Chapter 11 Case is in the best interest of the Company;

**NOW, THEREFORE, IT IS**

**RESOLVED:** That the Company hereby appoints, with the written consent of BC pursuant to the Term Sheet, Cordjia Capital Projects Group to serve as the Construction Advisor for the Company, subject to the terms set forth in the Construction Advisor engagement letter (the "Engagement Letter") dated June 13, 2025; and further

**RESOLVED:** Pursuant to this Written Resolution and the Engagement Letter, the Manager shall hereby fully and irrevocably delegate authority to the Construction Advisor related to operation, construction, and completion of the Property. The Company shall also take all such corporate actions as may be necessary to delegate authority to the Construction Advisor; and further

**RESOLVED:** The Company hereby expressly agrees that it shall not interfere with or change the Construction Advisor's role, and that the Construction Advisor shall have full authority to communicate directly with BC regarding

24821899.v4

operations as they relate to the Property, the sales process, and the financial affairs of the Debtor, provided that nothing herein shall (i) authorize the Construction Advisor to disclose to the Lender or any other third party confidential or attorney-client privileged information received by the Construction Advisor from the Company or Titan prior to the Construction Advisor's appointment hereunder, or (ii) constitute waiver of any such confidentiality or privilege by the Company or Titan; and further

**RESOLVED:**    The Company agrees that removing, replacing, changing, or interfering in the role of the Construction Advisor without BC's written consent shall constitute a default under the Term Sheet and shall entitle BC to exercise any and all appropriate remedies; and further

**RESOLVED:**    Pursuant to the Term Sheet, BC shall be responsible for costs and expenses related to the Construction Advisor, and to the extent that the BC advances funds related to the Construction Advisor, such amounts shall be deemed to be a protective advance.

Executed By    **Sole Member**

**Titan Funding Holdings 1, LLC**

**By: Titan Funding, LLC, its Manager**

Date:_____    By:_____
                             Edward Piazza, its President

**Manager**

Date:_____    By:_____
                             Edward Piazza, its Manager

24821899.v4



EXHIBIT

B

June 13, 2025

The Mark Real Estate Holdings, LLC
ATTN: Edward Piazza, Manager

**RE:  ENGAGEMENT LETTER**

Dear Mr. Piazza

Cordjia Capital Projects Group, LLC ("Cordjia") is pleased to provide you with professional services.

This engagement letter and the attached Terms and Conditions (Attachment A) embodies
the entire agreement regarding the services to be rendered by Cordjia to The Mark Real Estate
Holdings, LLC (the "Company").

On your instruction, Cordjia will provide support to the Company in connection with Construction
Advisory Services.  Generally, our engagement scope would consist of the following:

1.  Cash Flow and Cost-to-Complete Analysis
    a.  Assess how much funding is needed to complete the remaining work.
2.  Contract and Land-Use Review
    a.  Identify contractual and land-use regulatory risks (general contractor, subcontracts,
        design agreements)
3.  Schedule Critical Path Analysis
    a.  Review and provide an analysis of the contractor's schedule to complete the
        remaining work
4.  Project Monitoring and Oversight
    a.  Provide independent oversight of remaining work
    b.  Track progress, quality, and budget adherence
5.  Construction Claims Analysis
    a.  Identify and quantify potential or pending claims, if necessary:
    b.  Change orders
    c.  Delay claims
    d.  Disruption and acceleration claims
    e.  Assist in negotiation or litigation support
6.  Mechanics' Lien Advisory
    a.  Analyze exposure to liens
7.  Asset Recovery and Disposition Support
    a.  Provide support to sell construction asset
8.  Expert Witness and Litigation Support
    a.  Provide expert opinions in bankruptcy court or related litigation related to
        construction advisory services
    b.  Support with documentation, discovery, and testimony.

The Mark Real Estate Holdings, LLC                                             June 13, 2025
 Letter of Engagement

     9.  Stakeholder Communication Support
          a.  Assist in communicating with all stakeholders

Cordjia is authorized, on behalf of the Company, to communicate with and direct the general contractor, subcontractors, state and local code enforcement officers, and similar parties consistent with this letter.

Cordjia shall provide the Company with a monthly billing for services rendered. Please refer to Attachment B for the Fee Schedule.  Copies of all bills shall be provided to Builders Capital and Titan Funding.  Invoices will be paid by Builders Capital as protective advances.

The Company may request that Cordjia perform other additional services not contemplated by this engagement letter.  If this occurs, Cordjia will communicate with the Company regarding the scope and estimated cost of these additional services.  Engagements for additional services may necessitate that we amend this letter or issue a separate engagement letter to reflect the obligations of both parties.  In the absence of any other written communications documenting such additional services, Cordjia's services will be limited to and governed by the terms of this engagement letter.  Any amendment to this letter is subject to approval by Builders Capital.

Each party to this agreement reserves the right to terminate the agreement at any time by notifying the other party in writing at the address set forth herein, provided that the Company may not terminate this agreement without the prior written consent of Builders Capital.

Cordjia appreciates the opportunity to be of service to the Company.  If acceptable, please date and sign this letter and return a copy of it to us to acknowledge your agreement with the terms of this engagement.

We look forward to being of service to you.

Best Regards,                                            June 13, 2025

_____
Blaine M. Buck, A.I.A., P.E., CEM, CFM, PMP

Cordjia Capital Projects Group, LLC

PO Box 1367
Camden, ME 04843


_____
Edward Piazza
Manager
The Mark Real Estate Holdings, LLC

This letter and the Terms and Conditions (refer to Attachment A) shall not be altered in any manner and is only valid upon signature of both the Debtor and Cordjia Capital Projects Group, LLC.

## ATTACHMENT A

**CORDJIA CAPITAL PROJECTS GROUP, LLC**
**TERMS AND CONDITIONS**

Cordjia Capital Projects Group, LLC (the "Company") shall perform the services described in the attached Work Scope on behalf of the "Client" at a charge pursuant to either the fixed cost enumerated in the Work Scope or at the rates set forth in the Company's Fee Schedule for time and materials and under the conditions and circumstances set forth below:

**Billings/Payment:**

Invoices for the Company's services shall be submitted, at the Company's option, either upon completion of such services or at the end of each calendar month. All such invoices shall be payable within thirty (30) days, the outstanding balance shall bear interest at the rate of one (1%) percent per month from said thirtieth day or at the highest interest rate permitted by law, whichever is less. The Client shall pay any service, sales, or similar tax imposed upon the Company's services. It is further understood and agreed that if the Client fails to pay any invoice due to the Company within thirty (30) days after the date thereof, then the Company, without waiving any other claim or right against the Client, and without liability whatsoever to the Client, may terminate its performance hereunder. In the event of such termination, the Client agrees to promptly pay the Company for all services rendered through the date of termination. Such payment shall include: (a) full payment of all outstanding invoices, plus interest as stated above, plus (b) full payment of a final invoice for all work performed from the date of the last invoice outstanding through the date of termination. All amounts shall be paid in full, with interest as stated above, within ten (10) days after receipt by the Client of the final invoice. In the event that the Company places any invoice which is unpaid after the due date with an agency or an attorney for collection, the Client shall pay all costs and expenses of such collection, including without limitation attorney's fees and court costs, if any.

**Limitations:**

The Client recognizes that the Company's services are solely for the benefit of the Client and these services will include judgments based upon limited data rather than upon scientific fact. The Client understands that the Company may be required to make judgments or decisions based upon information provided by the Client or its contractors, and agrees that the Company may rely on such information in performing services under this Agreement. The Client understands and agrees that the services rendered by the Company shall be advisory only, and that the Client retains all decision-making responsibility with respect to all projects in which the Company participates. The Company shall perform its services in accordance with generally accepted practices in a manner consistent with that degree of care and skill ordinarily exercised by members of the same profession currently practicing under similar circumstances and in the same location and the Company shall be responsible solely for its own negligence. Any delayed use of the results of the Company's services will require updates.

The services of the company shall be rendered without any warranty, expressed or implied. In no event shall the company be liable for special, incidental, or consequential damages of any kind arising out of services performed hereunder by the company, its agents, employees, or other representatives, even if the company has been advised of the possibility of such damages. The total liability of the company to the client or any other person not a party to this agreement arising out of any services provided by the company hereunder shall not exceed the aggregate sum of company invoices submitted to the client for services performed hereunder.

The Client agrees to notify all contractors and/or subcontractors who may perform work in connection with any report or study prepared by the Company of the above limitations on the Company's liability for errors, omissions, or professional negligence, and to require, as a condition precedent of their performing work, a like limitation of liability against the Company. In the event that the Client fails to obtain a like limitation of liability, any liability of the Company to such contractor or subcontractor arising out of alleged error, omissions, or professional negligence shall be allocated between the Client and the Company in such a manner that the aggregate liability of the Company to all parties, including the Client, shall not exceed the aggregate amount of invoices submitted hereunder.

In the event that the Client makes a claim against the Company, at law or otherwise, for any alleged error, omission, or act arising out of the performance of the Company's services, and the Client fails to prove such claim upon final adjudication, then the Client shall pay all costs incurred by the Company in defending itself against such claim, including, without limitation, attorney's fees and costs and fees and expenses of experts. In no event may the Client bring any claim, action, or proceeding arising out of the services provided by the Company hereunder more than two (2) years after the date such services were provided.

Without limiting the generality of the above limitations on liability of the Company, the Company will not be liable for damage or injury arising from damage to or interference with subterranean structures (including without limitation, pipes, tanks, telephone cables, etc.) which are not called to the Company's attention and not correctly shown on the plans furnished by the Client in connection with work performed under this Work Scope.

**Right of Entry:**

The Client hereby authorizes the Company, or represents and warrants that authorization has been duly granted to the Company (if the project location is not owned by the Client), its agents, staff, consultants and contractors, or subcontractors, to enter upon the project location for the purpose of performing and with the right to perform all acts, studies, and research, including without limitation, the making of test borings, test pits, surveys, and other tasks, pursuant to the Work Scope. The Client hereby recognizes that the use of exploration equipment may unavoidably affect, alter or damage the terrain and affect vegetation, building, structures, and equipment, in, at, or upon the area being studied. The Client will not hold the Company liable or responsible for any such reasonable effect, alteration, or damage. The Client agrees to pay the Company an additional fee for any services performed at the Client's request to restore the condition of the area being studied.

**On-Site Services:**

Any services or monitoring provided by the Company at a site during project construction, remedial action, or other site activities are not intended to include review of the adequacy of any contractor's health and safety measures in, on, or near the construction site and will not relieve any contractor of its responsibilities for performing the work in accordance with applicable laws and regulations and with the plans and specifications. The Company and the Client agree that the contractor will be solely and completely responsible for working conditions on the job site, including health and safety of all persons and property during the performance of the work, and compliance with OSHA, NIOSH, U.S. EPA, and other applicable regulations.

**Duty of the Client:**

It shall be the duty of the Client to advise the Company promptly of any known or reasonably knowable oil or hazardous materials or any condition existing in, on, or near the premises upon which work is to be performed by the Company's employees or subcontractors that presents a potential or possible health hazard or nuisance. If the Client fails to advise the Company or, notwithstanding such advice, unanticipated occurrences of such substances or conditions are discovered during the course of the work, and such discovery in the judgment of the Company results in injury or a health risk to persons, whether the Company's personnel, the Client's personnel, or others, the Client agrees that it shall assume full responsibility and liability for any resulting personal injury, including disease, medical expenses and/or death, property damage, or economic loss, including consequential damages.

**Changes in Work Scope:**

If any unforeseen hazardous materials, other unforeseen conditions, or scope changes instructed by the Client are encountered during execution of the work which, in the judgment of the Company, significantly affect or may affect the work or the recommended Work Scope, the Company will notify the Client as soon as practicable. In such event, the Client and the Company agree to pursue one of the following: (1) if practicable, in the judgment of the Company, complete the original Work Scope; (2) modify the Work Scope and budget estimate to include study of the previously unforeseen conditions or scope changes instructed by the Client, with this Agreement being amended accordingly and in writing; or (3) terminate the Work Scope. In the event of termination, the Client agrees to pay the Company in full for all work completed

and fees due until written termination notice has been received by the Company, and to pay all costs incurred by the Company prior to and in connection with discontinuing the work hereunder, such as completion of files and preparation of a written report to the Client of findings to date of termination and all costs associated with subcontract termination. The Client also acknowledges that the Company may be required by statute, regulation, or court order to report the finding of oil or hazardous materials or certain other matters to state or federal authorities.

**Confidentiality:**

The Company will not disclose information about its services, its reports, or information which the Client has provided to the Company, without the Client's prior consent, except to the extent necessary (1) for the Company to perform its services, (2) to comply with professional standards to protect public health, safety, and the environment or (3) to comply with court orders, laws, governmental regulations, and other legal requirements. Information generally available to the public, technical information the Company may have developed independently and information the Company acquires from third parties without any breach of duty will not be considered confidential. The Company will not use any information obtained or developed by it in the course of the services except for the Client's benefit.

If by order of court, statute, or regulation ("orders"), the Company is required to disclose information in its possession, it shall give the Client prompt notice of such facts. Thereafter, the Company may, without liability to the Client or others, comply with such orders.

**Documents:**

All reports, plans, boring logs, field data, field notes, laboratory test data, calculations, estimates, and other documents prepared by the Company shall be the property of the Company. Any documents prepared by the Company which are not paid for by the Client, shall be returned upon demand and shall not be used by the Client for any purpose whatsoever. The Company will retain all pertinent records relating to performed services for a period of two (2) years following submission of the report or any other period mandated by law, during which period the records will be made available to the Client at the Company's Office at all reasonable times. Copies will be prepared by the Company for the Client for reasonable cost of reproduction. Reuse or modification of any such documents by Client, without the Company's written permission, shall be at the Client's sole risk and Client agrees to indemnify and hold Company harmless from all claims, damages, and expenses, including attorney's fees, arising out of such reuse by Client or by others acting through Client.

**Opinions of Cost:**

As the Company has no control over the cost of labor, materials, equipment, or services furnished by others, or over the Contractor(s)' methods of determining prices, or over competitive bidding or market conditions, the Company's opinions of probable Total Project Costs and Construction Cost provided for herein are to be made on the basis of the Company's experience and qualifications and represent the Company's best judgment as an experienced and qualified professional, familiar with the construction industry; but the Company cannot and does not guarantee that proposals, bids, or actual Total Project or Construction Costs will not vary from opinions of probable cost prepared by the Company. If prior to Bidding or Negotiating Phase, Client wishes greater assurance as to Total Project or Construction Costs, Client shall employ an independent cost estimator. The Company's services to modify the Contract Documents to bring the Construction Cost within any limitation established by Client will be considered Additional Services and paid for as such by Client.

**Value Engineering:**

If the Client retains the services of a Value Engineer (VE), it shall be at the Client's sole expense and shall be performed in a timely manner so as not to delay the orderly progress of the Company's services.

If the Company objects to recommendations made by the VE, it shall so state in writing to the Client. If the Client requires the incorporation of changes in the Construction Documents to which the Company has objected, the Client agrees to indemnify and hold harmless the Company from any damages, liabilities, or costs, including reasonable attorney's fees and costs of defense, from any claim which arises as a result of the incorporation of such changes required by the Client.

The Company shall be compensated for services to incorporate recommended value engineering changes into reports, drawings, specifications, bidding, or other documents. The Company shall be compensated as Additional Service for

all time spent to prepare for, review, and respond to the recommendations of the VE.

**Public Liability:**

Company represents and warrants that its staff is protected by Worker's Compensation insurance with statutory limits; and that Company has such coverage under Public Liability and Property Damage insurance policies which Company deems adequate. Certificates for all such policies of insurance shall be provided to Client upon written request. Only within and only to the extent of the limits and conditions of such insurance, Company agrees to indemnify and save Client harmless from any claims, demands, suits, or liabilities arising from any negligent acts by Company, its agents, staff, contractors, or consultants employed or engaged by it. In no event shall Company be liable or responsible for any loss, damage, or liability, including but not limited to fire and explosion, beyond the amounts, limits, and conditions of such insurance, or if such loss, damage, or liability is excluded from such coverage of such insurance.

**Reliance:**

The Client recognizes that the services and the contents of any project reports and associated documents provided to the Client by the Company are solely for the benefit of the Client and its heirs, successors and permitted assigns whose reliance thereon is not independent of Client's. The contents of any project reports and associated documents, including but not limited to any opinions and recommendations embodied therein, are not to be quoted or otherwise referenced to nor furnished to any other person, and no other personal shall be entitled to rely thereon, without the Company's prior written consent. The Company and the Client agree that such consent will be given by the Company only upon its receipt of (1) additional consideration in an amount sufficient in its sole discretion to compensate the Company for its additional exposure, and (2i) the written agreement of the third party seeking to rely upon the contents of any project reports and associated documents accepting the entire contents of this Agreement, including the specified Work Scope, the Terms and Conditions, and any additional limitations included within the body of the applicable reports and/or documents upon which reliance is sought.

**Severability and Reform:**

If any of these Terms and Conditions shall be finally determined to be invalid or unenforceable in whole or part, the remaining provisions hereof shall remain in full force and effect, and be binding upon the parties hereto. The parties agree to reform these conditions and to replace any such invalid or unenforceable provision with a valid and enforceable provision as close in meaning as possible to the intention of the stricken provision.

**General:**

Unless solved by mutual efforts of the parties hereto, all differences, disputes, or claims arising in connection with these Terms and Conditions or the services provided by the Company hereunder shall be finally settled by binding arbitration. Client and Company agree that they shall submit any and all unsettled claims, counterclaims, disputes, and other matters in question between them arising out of or relating to this Agreement to mediation in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association, effective as of this date of this Agreement except that no punitive damages may be awarded. It is understood that the decision in such arbitration shall be binding on both parties and that a judgment upon any award rendered may be entered in any court having jurisdiction.

The Work Scope, Fee, Schedule, and these Terms and Conditions constitute the entire agreement of the parties and there is no other agreement relating to the services to be rendered by the Company that is not expressed herein. This Agreement shall be governed by, and construed and enforced in accordance with, the substantive laws of The State of Maine without regard to its principles of conflicts of laws.

Each party is and shall perform this Agreement as an independent contractor and, as such, shall have and maintain complete control over all of its employees, agents (including without limitation, any subcontractors), and operations. Neither party nor anyone employed by it shall be, represent, act, purport to act, or be deemed to be the agent, representative, employee, or servant of the other party.

These Terms and Conditions shall take precedence over any inconsistent or contradictory provisions contained in any proposal, contract, purchase order, requisition, notice to proceed, or like document.

Cordjia Capital Projects Group is an equal opportunity employer.

2

# Cordjia Capital Projects Group LLC
# Fee Schedule
Effective January 1, 2025

| Item | 2025 Fee |
|---|---|
| Principal | 185.00 |
| Senior Project Manager | 165.00 |
| Project Manager | 145.00 |
| Project Leader | 125.00 |
| Administrative | 75.00 |

| Item | 2025 Fee |
|---|---|
| Mileage | 0.70 |
| AIA Contract Document | 150.00 |
| CD-R Disk with Case | 5.00 |
| Thumb Drive - 2-8 GB | 15.00 |
| Thumb Drive - 16-32 GB | 20.00 |
| Thumb Drive - 64 GB | 30.00 |
| Thumb Drive - 128 GB | 60.00 |
| 8.5x11 B/W Copies | 0.25 |
| 8.5x11 Color Copies | 0.50 |
| 11x17 B/W Copies | 0.50 |
| 11x17 Color Copies | 1.00 |
| 11x17 Laminating | 4.00 |
| 24x36 Scans | 2.00 |
| 18x24 Plots | 5.00 |
| 18x24 Foam Core Board | 10.00 |
| 24x36 Plots | 7.50 |
| 24x36 Laminating | 12.50 |
| 24x36 Foam Core Board | 12.50 |
| 30x42 Plots | 10.00 |
| 30x42 Foam Core Board | 15.00 |
| 36x42 Plots | 10.00 |
| Binder - .5"-1" | 15.00 |
| Binder - 1.5"-2" | 20.00 |
| Binder - 3"+ | 30.00 |
| Spiral-Comb Binding | 15.00 |
| Sub-Consultants | Cost + 15% |
| All other expenses | Cost + 15% |

# DeStefano & Associates, Inc.
## PLANNING • DESIGN • CONSTRUCTION

6/10/2025

**EXHIBIT C**

## THE MARK,
## CUMBERLAND, ME
## Cost to complete for CO

| DIVISION | DESCRIPTION OF WORK | VALUE |
|---|---|---|
| 01000 | GENERAL CONDITIONS | $ 11,150 |
| 01700 | SITE MANAGEMENT | $ 24,000 |
| 02200 | SITEWORK & NEW DRAIN | $ 38,500 |
| 02500 | LANDSCAPING | $ 4,000 |
| 03000 | CONCRETE | $ 5,000 |
| 06200 | FINISH CARPENTRY | $ 4,500 |
| 07250 | FIREPROOFING, | $ 21,000 |
| 07480 | SIDING,TRIM, RAILS, GUTTERS | $ 10,000 |
| 08000 | DOORS,FRAMES, HARDWARE | $ 2,000 |
| 08500 | WINDOWS & PATIO DOORS | $ 5,000 |
| 09250 | DRYWALL | $ 10,000 |
| 09900 | PAINTING | $ 15,000 |
| 10000 | SPECIALTIES & KITCHENS & VANITIES | $ 12,000 |
| 11000 | APPLIANCES | $ 1,000 |
| 14000 | ELEVATOR | $ 8,500 |
| 15300 | FIRE PROTECTION SPRINKLER | $ 2,000 |
| 15400 | PLUMBING | $ 4,000 |
| 15500 | HEATING, VENTILATION, AC | $ 9,500 |
| 16000 | ELECTRICAL/FA | $ 8,400 |
| **SUB-TOTAL** | | **$ 195,550** |
| 20000 | OFFICE OH&P | $ 29,333 |
| 30000 | CONTINGENCY | $ 22,488 |
| **TOTAL** | | **$ 247,371** |

CONFIDENTIAL
DESTEFANO & ASSOCIATES,inc.